Bruce HOWE, Representative of the Estate of Fred Charon, Plaintiff,

v.

Charles HULL, M.D., et al., Defendants.

No. 3:92CV7658.

United States District Court,
N.D. Ohio,
Western Division.

May 25, 1994.

See also 873 F.Supp. 72.

Ellen Simon Sacks, Spangenberg, Shibley, Traci, Lancione & Liber, Cleveland, OH, Doris K. Wohl, Wohl & Associates, Toledo, OH, for plaintiff Bruce Howe, as representative of the Estate of Fred L. Charon.

Doris K. Wohl, Wohl & Associates, Toledo, OH, for plaintiff Fred L. Charon.

Rolf M. Scheidel, Shumaker, Loop & Kendrick, Toledo, OH, for defendant Charles E. Hull, M.D.

James M.L. Ferber, Schottenstein, Zox & Dunn, Columbus, OH, Timothy D. Krugh, Robison, Curphey & O'Connell, Toledo, OH, for defendant Memorial Hosp.

## MEMORANDUM AND ORDER

JOHN W. POTTER, Senior District Judge:

This cause is before the Court on defendant Memorial Hospital's motion for summary judgment, defendant Charles Hull's motion for summary judgment, plaintiff's opposition [1], defendant Memorial Hospital's reply and supplemental reply, and defendant Hull's reply.

Plaintiff brought suit in the current action alleging that on April 17, 1992, defendants refused to provide Charon medical treatment because he was infected with HIV. Plaintiff claims that defendants' actions violate the Americans with Disabilities Act (ADA), the Federal Rehabilitation Act of 1973 (FRA), the Emergency Medical Treatment and Active Labor Act (EMTALA), and constituted intentional and negligent infliction of emotional distress under Ohio law. The defendants vehemently dispute these claims and allegations and have moved for summary judgment on all of plaintiff's claims.

In order to be entitled to summary judgment, defendants must establish that there are no material facts in dispute, thus presenting no triable issues to present to the jury. Under the Federal Rules,

> Summary judgment is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Supreme Court has stated that the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* [477 U.S. 242, 251–52] 106 S.Ct. 2505, 2512 [91 L.Ed.2d 202] (1986).... In reviewing a motion for summary judgment, however, all inferences " 'must be viewed in the light most favorable to the party opposing the motion.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* [475 U.S. 574, 588] 106 S.Ct. 1348, 1356–57 [89 L.Ed.2d 538] (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 [82 S.Ct. 993, 994, 8 L.Ed.2d 176] (1962)).

*Ralph Shrader, Inc. v. Diamond International Corp.,* 833 F.2d 1210, 1213 (6th Cir. 1987).

> *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated in that decision. If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

*Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, ——, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) (footnote omitted).

■ The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which [he] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law of the case identifies which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Therefore, only disputes of facts affecting the outcome of the suit under the applicable substantive law will preclude the entry of summary judgment. *Id.* A moving party may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 324–325, 106 S.Ct. at 2553–54. Where the moving party has met its initial burden, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the

---

**1.** The original plaintiff in this case was Fred L. Charon. A suggestion of Mr. Charon's death was filed with the Court on April 13, 1993, and plaintiff Howe was substituted as the representative of Mr. Charon's estate on June 10, 1993.

"pleadings, depositions, answers to interrogatories, and admissions on file." ... Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. It is particularly inappropriate for a court to engage in fact finding or resolve issues of witness credibility on summary judgment. *See, e.g., Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510; *Lashlee v. Sumner*, 570 F.2d 107 (6th Cir.1978).

On April 17, 1992, Charon and plaintiff Howe were travelling through Ohio, on their way to vacation in Wisconsin. Charon was HIV positive. That morning Charon took a floxin tablet for the first time. Floxin is a prescription antibiotic drug. Within two hours of taking the drug, Charon began experiencing fever, headache, nausea, joint pain, and redness of the skin.

Due to Charon's condition, Charon and plaintiff checked into a motel and, after consulting with Charon's treating physician in Maine, sought medical care at the emergency room of Fremont Memorial Hospital. Charon was examined by the emergency room physician on duty, Dr. Mark Reardon. There is some dispute over what Dr. Reardon's initial diagnosis of Charon's condition was.

Dr. Reardon testified that Charon suffered from a severe drug reaction, and that it was his diagnosis that this reaction was probably Toxic Epidermal Necrolysis (TEN).[2] Reardon depo. p. 17–22, 123–24. This diagnosis was also recorded in Charon's medical records. Dr. Reardon also testified regarding Charon's condition that "possibly it was an early stage of toxic epidermal necrolysis, although I had never seen one." Dr. Reardon had no prior experience with TEN, other than what he had read in medical school. Reardon depo. p. 42, 49, 102.

Plaintiff's medical expert Calabrese, however, testified that, after reviewing the medical records and Reardon's deposition, while Charon did appear to be suffering from a severe allergic drug reaction, Calabrese "did not believe that [TEN] was the likely or even probable diagnosis...." Calabrese depo. p. 24.

Prior to Charon's eventual transfer to the Medical College of Ohio, Dr. Reardon called Dr. Lynn at MCO and asked Lynn if he would accept the transfer of Charon. Dr. Lynn testified that at no time did Dr. Reardon mention that plaintiff had been diagnosed with the extremely rare and deadly TEN. Lynn affidavit at para. 7. Dr. Reardon also did not inform the ambulance emergency medical technicians that plaintiff was suffering from TEN.

Dr. Reardon determined that Charon "definitely needed to be admitted" to Memorial Hospital. Reardon depo. at p. 21. Since Charon was from out of town, procedure required that Charon be admitted to the on-call physician, Dr. Hull. Dr. Reardon spoke with Dr. Hull on the telephone and informed Dr. Hull that he wanted to admit Charon, who was HIV-positive and suffering from a non-AIDS related severe drug reaction.

While Dr. Reardon and Dr. Hull discussed Charon's situation, the primary area of their discussion appears to have been whether Charon's condition had advanced from HIV to full-blown AIDS. Dr. Hull inquired neither into Charon's physical condition nor vital signs, nor did he ask Dr. Reardon about the possibility of TEN. Hull depo. p. 76–78, 160. During this conversation, it is undisputed that Dr. Hull told Dr. Reardon that "if you get an AIDS patient in the hospital, you will never get him out," and directed that plaintiff be sent to the "AIDS program" at MCO.[3] When Dr. Hull arrived at the hospital after Dr. Reardon's shift but prior to Charon's transfer, he did not attempt to examine or meet with Charon.

It is undisputed that Charon was never admitted to Memorial Hospital. There does,

---

**2.** TEN is a very serious, very rare, and often lethal skin condition that causes an individual's skin to slough off the body.

**3.** Charon did not learn of these statements by Dr. Hull until several months later.

however, appear to be a dispute over who actually had the power and authority to transfer or admit an out-of-town emergency room patient to the Hospital. Dr. Reardon testified that the ultimate authority to transfer rested with him, but also indicated that the on-call physician is required to admit such patients. Reardon depo. p. 117, 115, 106.

Charon was transferred to the Medical College of Ohio some time after 8:45 P.M. on April 17. After his conversation with Dr. Hull and prior to the transfer, Dr. Reardon told Charon and plaintiff that "I'm sure you've dealt with this before ..." Howe asked, "What's that, discrimination?" Dr. Reardon replied, "You have to understand, this is a small community, and the admitting doctor does not feel comfortable admitting [Charon]." Howe depo. p. 50.

Plaintiff and defendants dispute whether Charon's physical condition was stable at the time of transfer and whether Charon's physical condition deteriorated during the transfer. See Reardon depo. p. 87–88, 114; Conley depo. p. 11–12, 20, 38. But see Waxman depo. p. 58–62, 96; Howe depo. p. 56–57.

Charon was admitted and treated at the Medical College of Ohio (MCO). Despite the TEN diagnosis, Charon was not diagnosed by MCO personnel as having TEN and, in fact, was never examined by a dermatologist.[4] After several days, Charon recovered from the allergic drug reaction and was released from MCO.

Defendant Hull has moved for summary judgment on plaintiff's EMTALA claim, arguing that the statute provides for no private cause of action against individual physicians. Whether the EMTALA provides a private action against physicians is apparently a case of first impression in this circuit, although the issue has been reached elsewhere.

■ The Emergency Medical Treatment and Active Labor Act was enacted by Congress in 1986 to prevent the perceived evils of patient "dumping"; that is, the transfer of a patient from one facility to another solely because of that patient's indigent or unin-

sured status. *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268–69 (6th Cir.1990). While nothing in the statute's legislative history shows a concern for anything other than indigent or uninsured patient dumping, the language of the statute itself contains no such limitations. Thus, the Sixth Circuit has held that the EMTALA provides a private cause of action against hospitals which, under certain circumstances discussed *infra*, provide a substandard medical screening or inappropriately transfer an emergency room patient. 42 U.S.C. § 1395dd(d)(2)(A). *See, e.g., Cleland*, 917 F.2d at 268–72; *Thornton v. Southwest Detroit Hospital*, 895 F.2d 1131, 1132–34 (6th Cir.1990).

■ Since there is no Sixth Circuit authority addressing whether the EMTALA creates a private cause of action against individual physicians, the Court must look to the statute itself. The precepts of statutory construction are well established: this Court must look to the plain language of the statute and apply it, unless that language is ambiguous or if such an application would lead to an absurd result. *Cleland*, 917 F.2d at 270.

■ The plain language of the EMTALA quite clearly provides that a civil action may be brought against a hospital:

"Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, *in a civil action against a participating hospital*, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate."

42 U.S.C. § 1395dd(d)(2)(A) (emphasis added). There is, however, simply no implication or ambiguity suggesting that Congress intended this action to extend to physicians.

Further bolstering this interpretation is the statute's legislative history. An earlier draft version of the EMTALA that provided a blanket civil action against unspecified defendants for violations of the statute was discarded because of this lack of specificity.

4. It appears that examination and treatment by a dermatologist and infectious disease specialist is

standard when TEN is suspected. *See* Hull depo. p. 142; Reardon depo. p. 26.

The version that was eventually passed into law clarified that "actions for damages may be brought *only against the hospital* which has violated the requirements of [the EMTALA]." H.R. 241, 99th Cong., 1st Sess., § 3 (1986) (emphasis added). Clearly, Congress consciously decided to exclude physicians from the parameters of this private cause of action.

Finally, not allowing a private action against physicians in these circumstances does not lead to an absurd result. Congress has great latitude in attacking a perceived evil and providing appropriate enforcement mechanisms. While allowing an action against physicians who violate the EMTALA may very well advance the statute's remedial purpose, Congress chose not to provide such a remedy. When Congress acts within the bounds of its constitutional authority, it is not this Court's function to expand or alter their clearly articulated design.

This issue has been addressed by several courts outside of this Circuit, and the majority have held that the EMTALA does not provide an action against physicians. *See e.g., Baber v. Hospital Corp. of America,* 977 F.2d 872 (4th Cir.1992); *Richardson v. Southwest Mississippi Regional Medical Center,* 794 F.Supp. 198 (S.D.Miss.1992); *Delaney v. Cade,* 756 F.Supp. 1476 (D.Kan. 1991), *aff'd in part and rev'd in part,* 986 F.2d 387 (10th Cir.1993); *Power v. Arlington Hospital,* 800 F.Supp. 1384 (E.D.Va.1992).

Plaintiff cites *Sorrells v. Babcock,* 733 F.Supp. 1189, 1193 (N.D.Ill.1990) as supporting his proposition that the EMTALA provides a private cause of action against both hospitals and physicians for unlawful patient dumping. While the *Sorrells* court did hold that the EMTALA provides a private action against physicians, it appears that, in discussing congressional intent, the court confused EMTALA's administrative enforcement procedures[5] with a private right of action. *See Id.* at 1193–94. The Court is not persuaded by the reasoning expressed in *Sorrells* and will not expand upon the clear language of the statute. Defendant Hull will be granted summary judgment on plaintiff's EMTALA claim.

Defendant Memorial Hospital has also moved for summary judgment on plaintiff's EMTALA claim, arguing that, as a matter of law, Charon was stable at the time of transfer. Plaintiff disputes this interpretation of the facts.

Defendant is correct that once an emergency room patient is stabilized, a hospital's responsibilities under the EMTALA end. 42 U.S.C. § 1395dd(b). If the patient is not stabilized, the hospital may transfer the patient to another facility only if the patient consents to the transfer, a physician properly certifies that the benefits of the transfer outweigh the risks,[6] and the transfer is "appropriate." 42 U.S.C. 1395dd(c)(1). The transfer is inappropriate if the hospital does not provide medical treatment within its capacity to minimize the risks to the patient's health. 42 U.S.C. § 1395dd(c)(2)(A). *See also Cleland,* 917 F.2d at 268, 272.

■ It is important to note that, even if Memorial Hospital did transfer Charon solely because of his HIV status, there will be no liability under the EMTALA if he was stabilized prior to the transfer. If Charon's condition was not stable, however, defendant could be liable if it provided Charon with substandard care due to his HIV status. *Cleland,* 917 F.2d at 272 (a hospital may be liable if, for any inappropriate reason, it provides service that is below the hospital's normal standards for care, screening or transfer: "these reasons might include: prejudice against the race, sex or ethnic group of the patient; distaste for the patient's condition (*e.g.* AIDS patients)...."). The initial inquiry then, focuses on whether the defendants stabilized Charon before the transfer.

■ Under the EMTALA, "stabilized" means that to a reasonable degree of medical

---

5. The EMTALA provides that the Secretary of Health and Human Services may bring an action against a physician who violates its provisions to bar his participation in Medicare, or to seek monetary administrative sanctions. 42 U.S.C. §§ 1395dd(d)(1), 1395dd(d)(2)(B).

6. Given the Court's disposition of the EMTALA issue, it need not reach the question of whether Charon was properly certified for transfer pursuant to 42 U.S.C. § 1395dd(c)(1)(A)(ii).

probability, no material deterioration of the [patient's] condition is likely to result from or occur during the transfer. 42 U.S.C. § 1395dd(e)(3)(B). Defendant has presented evidence that Charon's condition was in fact stable. Dr. Reardon and several of defendant's experts testified to this fact, and one of plaintiff's experts was unable to say that, to a reasonable degree of medical probability, a material deterioration of Charon's condition was likely to occur. Plaintiff has, however, presented sufficient evidence to create an issue of material fact in this regard.

Dr. Waxman testified that he did not agree that there was no material deterioration of Charon's condition during the transfer, and that there was a "50/50 chance" that a material deterioration in Charon's condition would occur at the time of transfer. Dr. Waxman further testified that Charon's vital signs were dangerous, that he would have been uncomfortable transferring Charon, and that Charon was in near-shock condition. From this testimony, a reasonable jury could find that defendant had not stabilized Charon prior to transfer.

The Court must next look to see if the transfer was improperly motivated, and if so, did defendant provide Charon with substandard care prior to transfer as a result of the improper motivation. *Cleland*, 917 F.2d at 272. In this case, defendant's asserted reason for the transfer was that Charon had TEN, a condition beyond the treatment capabilities of Memorial Hospital. Plaintiff has alleged that Charon was not diagnosed with TEN, and because Charon had HIV defendant Memorial Hospital transferred him without first providing him with treatment that was within defendant's capacity. In short, plaintiff claims defendant "dumped" Charon on MCO because defendant Memorial Hospital did not wish to treat an AIDS patient.

Applying the facts in the case at bar in the light most favorable to and drawing all reasonable inferences in favor of the plaintiff, the Court cannot conclude that defendant Memorial Hospital is entitled to summary judgment on plaintiff's EMTALA claim. Many of the facts are disputed, and a reasonable jury could find that Memorial Hospital provided Charon with a lesser degree of care because of his HIV status.

Much of this case turns on what in fact Dr. Reardon's initial diagnosis of Charon's condition was. Dr. Reardon testified that the diagnosis was TEN, and this is supported by the entry Dr. Reardon made in the medical records. However, Dr. Reardon also testified that Charon "possibly" had an early case of TEN, even though he had never seen one and had only read about TEN at medical school. Plaintiff's expert, however, testified that TEN was not the "likely or even probable" diagnosis. Dr. Reardon also never told Dr. Lynn, the admitting physician at MCO, about the TEN diagnosis. Given Dr. Reardon's conflicting testimony, the expert's analysis of Charon's medical records, and the fact that Dr. Reardon never told Lynn that Charon had an incredibly rare affliction which was the alleged reason for the patient transfer, a jury could reasonably conclude that the TEN diagnosis was a fabrication or ad hoc justification for Charon's transfer.

Since the evidence is contradictory as to Charon's actual diagnosis, most of Memorial Hospital's subsequent summary judgment arguments based upon this premise fail. Dr. Hull's statement about AIDS patients could cause a reasonable jury to believe that the sole reason for transfer was Charon's HIV status. Plaintiff also presented evidence that Charon was not given the appropriate medical treatment by defendant. Further, if the jury found that Charon's actual diagnosis was simply a non-AIDS-related severe allergic drug reaction, that jury could reasonably conclude that Memorial Hospital transferred Charon, while he was unstable, without providing him with necessary medical care that was within their capability to provide.

Given the disputed testimony and existence of genuine issues of material fact as to whether defendant stabilized Charon, whether the transfer to MCO was improperly motivated by Charon's HIV status, and whether defendant inappropriately transferred Charon, defendant Memorial Hospital's motion for summary judgment on the EMTALA is not well taken.

Defendant Hull next moves for summary judgment on plaintiff's claim brought under the Americans with Disabilities Act (ADA). The ADA prohibits discrimination by places of public accommodation:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Neither party disputes that Dr. Hull's private medical practice was not subject to the mandates of the ADA until after the events in question. The inquiry, then, must focus on whether Dr. Hull can be personally liable as an operator of a public accommodation within the meaning of the ADA. Dr. Hull asserts that he cannot be held liable under the ADA because he did not own, lease or operate Memorial Hospital. He is mistaken.

Given the relative recentness of the ADA, it is not surprising that there is little instructive authority, and virtually none on point in this Circuit. Absent controlling authority, the Court must look to the words of the statute and interpret their meaning. The Supreme Court has recently stated that when interpreting a statute

> [c]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.

*Connecticut National Bank v. Germain*, 503 U.S. 249, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citations omitted). The Court, then, must examine the term "operate" and determine if it has a plain, unambiguous meaning that fits within the statutory framework of the ADA.

While certainly not dispositive of the issue, "operate" is, in pertinent part, thus defined: "to perform a function: exert power or influence." *Webster's Ninth New Collegiate Dictionary* (1983). Black's defines "operate" similarly: "[t]o perform a function, or operation, or produce an effect." *Black's Law Dictionary*, 5th Ed. (1979). In common usage, then, "operate" implies the performance of some sort of function, in conjunction with a degree of sanctioned authority. This seems consistent with the ADA, which contemplates that an owner or an operator of a public accommodation may be held liable for violations of its provisions. 42 U.S.C. § 12182(a).

The Court is aware, however, that this definition of "operate" implies that a person may be held liable in their individual, rather than official, capacity for violations of the ADA. The Court is also aware that there is a line of authority that has been loathe to allow individual liability for violations of Title VII and the ADEA. *See, e.g., Miller v. Maxwell's International*, 991 F.2d 583, 587 (9th Cir.1993) (holding that Congress did not intend for individual employees to be liable as an "employer" for violations of Title VII and the ADEA). *But see United States v. Morvant*, 843 F.Supp. 1092 (E.D.La.1994) (allowing individual liability for the operator of a dental office under the ADA); *EEOC v. AIC Security Investigations, Ltd.*, No. 92C7330, 1993 WL 427454, at 9 (N.D.Ill. Oct. 21, 1993) ("[a]bsent a clear and express statutory directive to the contrary, this court does not believe that the remedial purposes of the ADA were intended to relieve from personal liability those supervisory employees committing discriminatory acts"); *Vakharia v. Swedish Covenant Hospital*, 824 F.Supp. 769, 784–86 (N.D.Ill.1993) (personal liability must be based on individual acts distinct from institutional procedure).

Cases not allowing individual liability for Title VII and ADEA violations in the employment context are not, however, applicable to the law and facts in the case at bar. The Title VII employment cases precluding personal liability had their genesis at the time when Title VII only allowed for back pay as damages; it thus seems logical to construe the earlier version of that statute not to apply to individuals. Given the broad language and remedial purposes of the ADA, however, allowing individual liability in some circumstances under 42 U.S.C. § 12182(a) is consistent with both the plain language of the statute and congressional intent. To hold differently would allow individuals with both

the authority and the discretion to make decisions based on a discriminatory agenda to violate the ADA with a degree of impunity not envisioned by Congress.

■ This Court holds that, under 42 U.S.C. § 12182(a), an individual may be liable as an operator of a public accommodation where (a) he or she is in a position of authority; (b) within the ambit of this authority he or she has both the power and discretion to perform potentially discriminatory acts; and (c) the discriminatory acts are the result of the exercise of the individual's own discretion, as opposed to the implementation of institutional policy or the mandates of superiors.

■ On these facts, the Court is unable to say as a matter of law that defendant Hull did not operate Memorial Hospital. It appears that defendant Hull was in a position of some authority within Memorial Hospital: he was a Vice Chief of Staff, the Medical Director of Special Services, and as the on-call admitting physician he had the authority and discretion to admit Charon to the hospital for treatment. The "business" of a hospital is the treatment of sick patients, and based on this evidence a jury could find that defendant Hull used his authority and discretion to deny plaintiff treatment for his non-HIV-related drug reaction solely on the basis of his HIV status. Defendant Hull's motion for summary judgment on plaintiff's ADA claim is not well taken.

Defendant Memorial Hospital and defendant Hull also move for summary judgment on plaintiff's ADA claim as well as plaintiff's FRA claim, on the basis that the evidence does not establish that Charon was denied treatment solely on the basis of his HIV status, and that plaintiff was not "otherwise qualified" for treatment due to the TEN diagnosis.

Before examining the merits of defendants' contentions, the Court must look at and compare the applicable parameters of the ADA and FRA. There are three basic criteria plaintiff must meet in order to establish a prima facie case of discrimination under the ADA:

a) the plaintiff has a disability;

b) the defendants discriminated against the plaintiff; and

c) the discrimination was based on the disability.

42 U.S.C. § 12182(a) 42 U.S.C. § 12182(b). The discrimination can take the form of the denial of the opportunity to receive medical treatment, segregation unnecessary for the provision of effective medical treatment, unnecessary screening or eligibility requirements for treatment, or provision of unequal medical benefits based upon the disability. 42 U.S.C. § 12182(b)(1)(A)(i), § 12182(b)(1)(A)(iii), § 12182(b)(2)(A)(i), § 12182(b)(1)(A)(ii). A defendant can avoid liability by establishing that it was unable to provide the medical care that a patient required. 28 C.F.R. § 36.302(b)(1).

Similarly, to establish a prima facie case under the FRA the plaintiff must show

a) the plaintiff has a disability;

b) plaintiff was otherwise qualified to participate in the program;

c) defendants discriminated against plaintiff solely on the basis of the disability; and

d) the program received federal funding.

29 U.S.C. § 794(a).

As this Court has already stated, a reasonable jury could conclude that the TEN diagnosis was a pretext and that Charon was denied treatment solely because of his disability. Further, there is no evidence to support the conclusion that Memorial Hospital was unable to treat a severe allergic drug reaction. In fact, the evidence indicates that Dr. Reardon initially planned to admit Charon for treatment. Therefore, Charon was "otherwise qualified" for treatment within the meaning of the FRA. Defendants' arguments in this regard are not persuasive.

The Court notes that defendant Memorial Hospital argues that the "solely on the basis of ..." standard that appears in the FRA should be imported into the ADA as well. This argument is without merit.

■ The FRA states that "no otherwise qualified individual with a disability ... shall, solely by reason of his or her disability ... be subjected to discrimination...." 29

U.S.C. § 794(a). The equivalent portion of the ADA reads "No individual shall be discriminated against on the basis of disability...." 42 U.S.C. § 12182(a). It is abundantly clear that the exclusion of the "solely by reason of ... disability" language was a purposeful act by Congress and not a drafting error or oversight:

The Committee recognizes that the phrasing of [42 U.S.C. § 12182(a) ] differs from section 504 by virtue of the fact that the phrase "solely by reason of his or her handicap" has been deleted. The deletion of this phrase is supported by the experience of the executive agencies charged with implementing section 504. The regulations issued by most executive agencies use the exact language set out in [42 U.S.C. § 12182(a) ] in lieu of the language included in the section 504 statute.

H.R.Rept. 101–485(II), 101st Cong., 2d Sess., 85 (1990).

■ The inquiry under the ADA, then, is whether the defendant, despite the articulated reasons for the transfer, improperly considered Charon's HIV status. *Id.* at 85–86. More explicitly, was Charon transferred for the treatment of a non-AIDS related drug reaction because defendant unjustifiably did not wish to care for an HIV-positive patient? Viewing the evidence in the light most favorable to the plaintiff, the Court finds plaintiff has presented sufficient evidence to preclude a grant of summary judgment on these claims. Defendant Memorial Hospital's motion for summary judgment on the plaintiff's ADA and FRA claims will be denied.

Defendant Hull also moves for summary judgment on plaintiff's FRA claim arguing that Dr. Reardon, and not Hull, made the decision to transfer Charon to MCO. A reasonable jury, however, could determine that Charon had to be admitted to Memorial Hospital by Dr. Hull. If Dr. Hull would not admit Charon due to his HIV status, it is not unreasonable that defendant Hull be held liable for the subsequent denial of medical care.

Defendant Hull further argues that the FRA does not apply to him in this instance because, even though Memorial Hospital receives federal funding, Hull did not with respect to plaintiff's care. Defendant's reliance on *United States Dept. of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), is misplaced, however. *Paralyzed Veterans* does narrow the scope of who "receives" federal funds under the FRA. *Id.* at 606, 106 S.Ct. at 2711. Unfortunately for defendant, the FRA was subsequently amended and the scope of its application broadened by Congress in The Civil Rights Restoration Act of 1987, Pub.L. 100–259, 102 STAT. 28 (1988). *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, ——, 112 S.Ct. 1028, 1036, 117 L.Ed.2d 208 (1992); *Leake v. Long Island Jewish Medical Center*, 869 F.2d 130 (2nd Cir.1989).

■ For the purposes of the FRA, a program or activity that receives federal funds is defined as:

"*all of the operations* of ... [a] corporation, partnership, or other private organization, or an entire sole proprietorship which is principally engaged in the business of providing healthcare ... *any part of which* is extended Federal financial assistance."

29 U.S.C. § 794(b). Defendant Hull in his various capacities at Memorial Hospital is a part of the "operations of" the hospital. Defendant also receives Medicare and Medicaid funding in his own practice. Defendant cannot receive federal funds on the one hand, and on the other deny he is covered by the FRA simply because he received no federal funds for his involvement with Charon. Defendant's motion for summary judgment on plaintiff's FRA claim is not well taken.

■ Defendants next move for summary judgment on plaintiff's state law intentional and negligent infliction of emotional distress claims. Ohio has adopted the tort of intentional infliction of emotional distress as defined by the Second Restatement of Torts. *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983). A claim for intentional infliction of emotional distress requires that: a party act with intent to cause or recklessly causes emotional distress; the party's conduct is extreme and outrageous;

the conduct causes serious emotional distress. *Id.* at syllabus.

Defendants argue that Charon was not subject to outrageous conduct, that there is no evidence Charon suffered severe emotional distress, that defendant Hull's statement about AIDS patients was made out of Charon's presence, and that defendant Hull did not act intentionally or recklessly with respect to Charon's emotional distress. The Court will address these arguments in turn.

■ Plaintiff's emotional distress claim rests on his theory of this case—that defendants unjustifiably refused to treat or admit Charon to Memorial Hospital because he was HIV-positive. It is the refusal to treat for a discriminatory reason, rather than defendant Hull's comment about AIDS patients, that gives rise to this claim. Plaintiff has adduced evidence by which a jury could find that defendants refused to treat Charon because of the perception that he had AIDS. This Court is not prepared to say that, as a matter of law, a physician's refusal to treat a seriously ill patient for any discriminatory reason is not extreme and outrageous conduct.[7] Defendants' first argument is not well taken.

■ Defendants assert that Charon did not suffer severe and debilitating distress as a result of this incident. Plaintiff, however, has presented evidence that after the incident Charon became withdrawn, depressed, careless about his personal appearance, and feared leaving or driving any distance away from his home. Under Ohio law, this evidence is sufficient to establish a claim for emotional distress. *Walter v. Marion Production Credit Assoc.,* 42 Ohio App.3d 215, 537 N.E.2d 676 (1987).

Defendants next argue that defendant Hull's comment was made out of Charon's presence, precluding a claim for intentional infliction of emotional distress. As plaintiff's claim does not rest on the comment itself, however, this argument goes to defendant Hull's intent or recklessness. The Court will treat the two arguments simultaneously.[8]

■ There is no evidence that defendant Hull intended to cause Charon severe emotional distress. Plaintiff argues that by refusing to admit or even examine Charon a jury could conclude that defendant Hull intended to harm Charon. This argument is misplaced. The intent to harm is irrelevant to this cause of action; rather, the intent must be to cause severe emotional distress. This claim, then, will stand or fall on whether or not a jury could find that defendant Hull's actions were reckless.

■ The outrageous act complained of is the unjustified refusal to treat Charon. "Reckless" applies where an actor acts with deliberate disregard to "a high degree of probability that emotional distress" will follow the action. Restatement of Torts 2d (1965), § 46, Comment i. *See also Thompson v. McNeill,* 53 Ohio St.3d 102, 104–05, 559 N.E.2d 705 (1990). In this case the plaintiff obviously would discover that he was being refused admission and treatment when he was transferred. As the refusal to admit alone cannot be the basis for this claim, the inquiry then must focus on whether there was a high degree of probability that plaintiff would discover that he was refused treatment because of his HIV status.

When Dr. Reardon attempted to admit Charon to Memorial Hospital, he telephoned defendant Hull, and they discussed the situation. Following this conversation, Dr. Reardon made notes of the conversation. These notes read: "I contacted Dr. Charles Hull who was on medical backup and he refused admission of the patient stating "if you get

---

**7.** The Court notes that under Ohio law, threat of injury, deceiving an employee into conducting illegal activity, interfering with parental visitation rights, concealment of property liens, and sexual harassment can all be the basis for intentional infliction of emotional. distress claims. *See, e.g., Yeager,* 6 Ohio St.3d at 375, 453 N.E.2d 666; *Reamsnyder v. Jaskolski,* 10 Ohio St.3d 150, 462 N.E.2d 392 (1984); *Brown v. Denny,* 72 Ohio App.3d 417, 594 N.E.2d 1008 (1991); *Walter v.* *Marion Production Credit Association,* 42 Ohio App.3d 215, 537 N.E.2d 676 (1987).

**8.** Defendants also note that Charon did not learn of Hull's comment until months after the incident. However, from Mr. Howe's testimony, a jury could conclude that Charon learned of the alleged discriminatory motive contemporaneously with the refusal to admit.

an AIDS patient in the hospital, you will never get him out.'" From this, a jury could conclude that, defendant Hull refused to admit Charon to Memorial Hospital because Hull thought Charon had AIDS.

Dr. Reardon then decided to transfer Charon to MCO. The EMTALA requires that, prior to transfer, a patient give his informed consent to the transfer. As federal law requires that a patient be told why he is being transferred, there is a high degree of probability that Charon would be told of the reason for his transfer:[9] the admitting physician at Memorial Hospital did not want to admit an AIDS patient.

The Court must presume that defendant Hull is familiar with the concept of informed consent and the requirements of the law with respect to the transfer of an emergency room patient. This Court therefore finds that a jury could conclude that defendant Hull acted recklessly with respect to the possibility of Charon suffering extreme emotional distress as a result of refusing Charon medical treatment.

Defendants lastly argue that they are entitled to summary judgment as a matter of law on plaintiff's claim for negligent infliction of emotional distress. The Court agrees. Ohio recognizes that a cause of action can be stated for the negligent infliction of emotional distress without contemporaneous physical injury if the plaintiff is the bystander to or a victim in an accident. *Paugh v. Hanks,* 6 Ohio St.3d 72, 451 N.E.2d 759 (1983); *Schultz v. Barberton Glass Co.,* 4 Ohio St.3d 131, 447 N.E.2d 109 (1983). The cases cited, however, all require the plaintiff to either be the witness to or placed in physical peril by an accident. The facts before the Court simply do not fit this cause of action as it exists in Ohio. Defendants will be granted summary judgment on this claim.

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that defendant Hull's motion for summary judgment as to the EMTALA

and negligent infliction of emotional distress claims is GRANTED, and DENIED as to the ADA, FRA and intentional infliction of emotional distress claims; and it is

FURTHER ORDERED that defendant Memorial Hospital's motion for summary judgment on the negligent infliction of emotional distress claim is GRANTED, and DENIED as to the EMTALA, ADA, FRA and intentional infliction of emotional distress claims.

---

9. Whether or not Charon actually learned of the alleged discrimination as a result of the EMTALA transfer requirements is irrelevant. What matters for the purposes of this cause of action is the probability at the time Hull refused to admit Charon that Charon would learn of the reason for his transfer.