The ESTATE OF Ellen ALCALDE,
etc., and Mary Burns,
Plaintiffs,

v.

DEATON SPECIALTY HOSPITAL
HOME, INC.; University of Maryland
Medical System Corporation; Charulata P. Mehta, M.D., and John Ruth,
M.D., Defendants.

No. Civ AMD 99–1840.

United States District Court,
D. Maryland.

March 5, 2001.

Stuart Jay Robinson, Bel Air, MD, Marc P. Charmatz, National Association of the Deaf, Silver Spring, MD, Mary Caroline Vargas, Silver Spring, MD, for Mary Burns.

Michael J. Baxter, Baxter Baker Sidle & Conn, P.A., Jonathan Eric Goldberg, Mark A. DiAntonio, Baltimore, MD, for Deaton Specialty Hospital and Home, Inc., Univer-

sity of Maryland Medical System Corporation.

Deborah Anne Krohn, Baltimore, MD, Malinda S. Siegel, Linda M. Fotheringill, Siegel & Fotheringill, LLC, Towson, MD, for Charulata P. Mehta.

Ronald Upton Shaw, Shaw and Brown, Towson, MD, Harry P. Stringer, Jr., Mudd, Harrison and Burch, Towson, MD, Anthony J. Breschi, Shaw & Morrow, P.A., Towson, MD, for John Ruth.

### MEMORANDUM

DAVIS, District Judge.

Mary Burns, proceeding both individually and as the personal representative of the estate of her daughter ("Plaintiff"), has brought this lawsuit against the following health care providers: Deaton Specialty Hospital and Home, Inc., University of Maryland Medical System Corporation, Charulata P. Mehta, M.D., and John Ruth, M.D. Plaintiff's amended complaint asserts claims against all defendants for: (1) violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794; (2) professional malpractice; (3) failure to obtain informed consent; and (4) intentional infliction of emotional distress.[1] The federal claims are supported by federal question jurisdiction and the state law claims are supported by the supplemental jurisdiction statute, 28 U.S.C. § 1367.

Plaintiff's claims arise out of events that took place during the hospitalization of her decedent, Ellen Alcalde, at a medical care facility operated by the corporate defendants between June 26, 1996, and September 25, 1996. Now pending, after several preliminary missteps,[2] are the defendants'

respective motions to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The issues are fully briefed and no hearing is necessary. For the reasons stated herein, the motions shall be granted in part and denied in part.

### I

 It is well settled, of course, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, the plaintiff is not required to "set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 47, 78 S.Ct. 99. In evaluating a motion to dismiss under Rule 12(b), the court must accept the well-pled allegations of the complaint as true, and construe all facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997). The court need not, however, accept conclusions of law or unwarranted deductions of fact. *See Mylan Lab., Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1059 (D.Md.1991).

### II

The factual allegations of the amended complaint are straightforward and are accepted as true for purposes of the pending

---

1. The amended complaint contains other claims which plaintiff has agreed to dismiss. Ellen Alcalde's surviving children, Tova Alcalde (an adult) and Ontel Alcalde (a minor), were also named as plaintiffs in the amended complaint, however, plaintiff has agreed to the dismissal of all claims asserted by or on behalf of the two children.

2. Maryland law requires litigants seeking redress for "medical injury" caused by a "health care provider" to exhaust administrative arbitration procedures before filing suit in court. *See* Md.Code Ann., Cts. & Jud.Proc. § 3–2A–02(a) (Michie 1998); *see also Oxtoby v. McGowan*, 294 Md. 83, 447 A.2d 860, 864–65 (1982) (clarifying that § 3–2A–02(a) creates a condition precedent to the institution of a court action).

motions. Ms. Burns is the surviving mother of Ms. Alcalde, who was deaf. Ms. Alcalde's "native language" and primary mode of communication was sign language.

In 1996, Ms. Alcalde was hospitalized at Fallston General Hospital after suffering respiratory failure, tracheal separation and pneumonia. On or about June 26, 1996, she was transferred to Deaton/UMMS's Ventilator Unit for long-term care and weaning from a ventilator.[3] Ms. Alcalde was a competent and conscious adult, otherwise able to make decisions regarding her health care. Plaintiff alleges, however, that Ms. Alcalde was prevented from doing so because defendants ignored and/or denied repeated requests that they provide sign-language interpreter services, as well as a telecommunication device for the deaf ("TDD"), during Ms. Alcalde's treatment.[4]

From June 26, 1996, until September 5, 1996, defendants attempted to wean Ms. Alcalde from a ventilator. She underwent numerous tests and procedures. Defendants allegedly documented communication difficulties between Ms. Alcalde and various hospital staff members, including nurses, therapists, doctors and social workers.

On September 5, 1996, defendants transferred Ms. Alcalde to Union Memorial Hospital for tracheal separation surgery to reduce aspirated pneumonia incidents. Defendants failed to tell Ms. Alcalde why she was being transferred or that surgery would be performed.

After surgery, on September 10, 1996, Ms. Alcalde was returned to UMMS under defendants' care. Again, defendants allegedly noted communication difficulties with Ms. Alcalde and documented the

need to develop better communication strategies, as Ms. Alcalde seemed "depressed" when she did not understand communications. Defendants allegedly cited "impaired communication" as a problem and acknowledged that sign-language interpreter services were necessary to resolve their inability to communicate with Ms. Alcalde. Notwithstanding these observations, no interpreters were ever provided during Ms. Alcalde's 89–day hospitalization.

On September 25, 1996, Ms. Alcalde's tracheal shunt was removed without explanation and without her permission. Sometime during the night of September 25, 1996, and early morning hours of September 26, 1996, Ms. Alcalde suffocated. Defendants discovered her, without a pulse, at approximately 7:00 a.m. Ms. Alcalde required a "Code Blue," as she was not breathing, and she was unresponsive and in cardiac arrest. She was transferred to Mercy Hospital, and without ever regaining consciousness, she died ten days later at age forty-one. The cause of death was hypoxic brain injury. Thereafter, this case was instituted.

### III

Section 504 of the Rehabilitation Act of 1973 ("the Act") provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).[5] In order

---

**3.** Deaton was purchased by UMMS at some point during the course of Ms. Alcalde's hospitalization.

**4.** Defendants, on the other hand, allege that in addition to sign language, Ms. Alcalde communicated by writing, gesturing, and lip reading. Of course, this factual dispute is not before me at this time.

**5.** The statute provides a remedy to "any person aggrieved" by its violation. 29 U.S.C. § 794a(a)(2). Although defendants in their motion do not challenge Ms. Burns's right to bring a § 504 claim, it bears mentioning that this provision extends standing to individuals with disabilities who have been injured under the Act, as well as to individuals *associated* with persons with disabilities, so long as they have constitutional standing under Article III.

to establish a violation of § 504, plaintiff must prove that: (1) Ms. Alcalde had a disability; (2) she was otherwise qualified to receive medical services from defendants; (3) she was excluded from participation in, was denied the benefits of, or was subjected to discrimination in the receipt of medical services solely by reason of the disability; and (4) defendants received federal financial assistance. *See Proctor v. Prince George's Hosp. Ctr.,* 32 F.Supp.2d 820, 826 (D.Md.1998) (citing *Doe v. Univ. of Maryland,* 50 F.3d 1261, 1265 (4th Cir.1995)). The amended complaint alleges sufficient facts to support each of these elements. *See* Amended Compl. ¶¶ 15–16, 18–20.

Defendants do not dispute that Ms. Alcalde had a disability, that she was qualified to receive medical services from defendants, or that they received federal financial assistance. Rather, the motions focus on Ms. Alcalde's ability to participate meaningfully in her medical treatment and her alleged need for interpreter services to communicate effectively with defendants. Specifically, defendants contend that plaintiff fails to state a valid claim under § 504 because there is no *per se* rule that the Act requires sign language interpreters in hospital settings. In addition, defendants argue that plaintiff fails to state a claim against Drs. Ruth and Mehta because physicians who treat patients in hospitals cannot be held individually liable under the Act for disparate treatment at the hospital. As explained below, these arguments do not warrant dismissal of the amended complaint.

### A

Regulations promulgated under the Act require recipients of federal funds that employ fifteen or more persons in the provision of health, welfare, and other social services to "provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the services in question." 45 C.F.R. § 84.52(d)(1). The regulations explain that "auxiliary aids may include ... interpreters." *Id.* § 84.52(d)(3). The Supreme Court has recognized that these regulations are an important source of guidance on the meaning of § 504. *See Alexander v. Choate,* 469 U.S. 287, 305 n. 24, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (citations omitted).

■ Thus, while it is true that there is no *per se* rule that sign language interpreters are necessary in hospital settings, violations of § 504 may be found where hearing-impaired patients have been denied access to sign language interpreters. *See, e.g., Proctor v. Prince George's Hosp. Ctr.,* 32 F.Supp.2d 820, 827 (D.Md.1998) ("Courts have found violations of the Rehabilitation Act and the ADA in cases where public accommodations, or public entities, failed to provide sign language interpreters.") (citations omitted). The test is whether an interpreter was necessary to provide the hearing-impaired individual with an equal opportunity to benefit from the services provided by defendants to patients who do not suffer from a hearing impairment. *See Falls v. Prince George's Hosp. Ctr.,* Civil No. DKC 97–1545, slip op. at 17 (D.Md. March 16, 1999). That test presents a question of fact. *See id.* at 20 (denying summary judgment because a jury could reasonably conclude that the hearing impaired plaintiff was not provided benefits and services equal to those provided hearing patients); *see also Proctor,* 32 F.Supp.2d at 828 (denying summary judgment because "it remains for the finder of fact to determine whether [defendant] provided adequate auxiliary aids.").

■ As explained above, the amended complaint alleges sufficient facts to support a *prima facie* case under § 504, and

---

See, e.g., Innovative Health Sys. v. City of White Plains, *117 F.3d 37, 47 (2d Cir.1997).*

Ms. Burns claims such "associational" standing here.

no more is required. " '[N]otice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47–48, 78 S.Ct. 99. Accordingly, plaintiff must be afforded an opportunity to conduct discovery before a determination is made as to whether sign-language interpreter services were necessary to provide Ms. Alcalde with an equal opportunity to benefit from defendants' services. Defendants' argument that there is no *per se* rule that sign language interpreters are necessary in hospital settings is plainly inapposite. Plaintiff has stated a valid claim against Deaton and UMMS under § 504 of the Rehabilitation Act of 1973, and the motions to dismiss shall be denied.

### B

■ The same conclusion obtains with respect to the potential individual liability of the defendant physicians. Section 504 extends to physicians who receive federal monies in their private practice. *See* 29 U.S.C. § 794(b)(3)(A)(ii) (defining a "program or activity" as an entire partnership or an entire sole proprietorship principally engaged in the business of providing health care which is extended federal financial assistance). Funding from programs such as Medicare and Medicaid constitutes federal financial assistance under § 504. *See, e.g., Howe v. Hull*, 874 F.Supp. 779, 789 (N.D.Ohio 1994); *Vacco v. Mid Hudson Med. Group, P.C.*, 877 F.Supp. 143, 149–50 (S.D.N.Y.1995).

■ Defendants argue that plaintiff fails to state a § 504 claim against Drs. Ruth and Mehta because they cannot be held individually liable for the policies and procedures at Deaton/UMMS.[6] They assert that "there is a distinction between a physician seeing a patient in his private office versus a hospital setting." Dr. Ruth's Mot. Dismiss at (unnumbered) pp. 2–3. In support of this argument, defendants rely heavily on a student-authored law review article.[7] *See id.* at 3 (citing Elizabeth Ellen Chilton, Note, *Ensuring Effective Communication: The Duty of Health Care Providers to Supply Sign Language Interpreters for Deaf Patients*, 47 Hastings L.J. 871, 878–79 (1996)). Citing to the article, defendants argue that "[d]octors practicing within hospitals are liable under the Rehabilitation Act only insofar as they control the hospital's policies and practices." *Id.* However, defendants (like the author of the article) support this proposition solely with case law decided under the Americans with Disabilities Act. *See id.* at 3–4 (citing *Howe v. Hull*, 874 F.Supp. 779 (N.D.Ohio 1994); *Aikins v. St. Helena Hosp.*, 843 F.Supp. 1329 (N.D.Cal. 1994)).

Reliance on ADA case law with respect to this issue is inappropriate because the statutory language in the ADA differs significantly from § 504. The ADA prohibits discrimination "by any person who owns, leases (or leases to), or operates a place of public accommodation," 42 U.S.C. § 12182(a), while § 504 prohibits discrimination "under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a). The latter statute is

---

**6.** The argument was made by Dr. Ruth and incorporated by reference in the motions filed by Dr. Mehta, Deaton and UMMS. It is curious that Deaton and UMMS have adopted Dr. Ruth's position, as he essentially argues that he is not liable for their discriminatory policies, suggesting, of course, that Deaton and UMMS may have violated § 504.

**7.** Ironically, the article supports plaintiff's § 504 claim, as it argues that the provision of

a qualified sign language interpreter is the only way to achieve effective communication in medical settings, and therefore should be required, *per se*, under both § 504 and the ADA. *See* Elizabeth Ellen Chilton, Note, *Ensuring Effective Communication: The Duty of Health Care Providers to Supply Sign Language Interpreters for Deaf Patients*, 47 Hastings L.J. 871, 873 (1996).

broader in that it encompasses any program or activity that receives federal funds, while the former only covers persons who own, lease, or operate places of public accommodation. The issue in both of the cases cited by defendants was the construction of the ADA's qualifying language, "owns, leases (or leases to), or operates," which does not appear in § 504. Both cases conclude that this language implies some sort of control or authority. *See Aikins v. St. Helena Hosp.*, 843 F.Supp. 1329, 1335 (N.D.Cal.1994) (holding that "own, lease[ ] (or lease[ ] to), or operate[ ]" implies a requirement of control over the place providing services); *Howe*, 874 F.Supp. at 787 (finding that 'operate' implies the performance of a function in conjunction with a degree of sanctioned authority).

Defendants overlook the fact that the plaintiff in *Howe* sued Dr. Hull under § 504 as well as under the ADA, and that the court denied Dr. Hull's motion for summary judgment. The court held that a physician who receives federal funds in his private practice may also be subject to liability under § 504 when treating patients at a hospital. *See Howe*, 874 F.Supp. at 789. Thus, while the court evaluated the doctor's control and authority over hospital policies for determining individual liability under the ADA, it emphasized the receipt of federal funds when determining liability under § 504. In sum, the court did not apply the ADA "control and authority" test to the plaintiff's § 504 claims.[8]

Even if the ADA analysis for determining individual liability were applicable for § 504 claims, there still remains a question of fact as to the amount of control and authority that Drs. Ruth and Mehta possessed over Deaton/UMMS's policies during Ms. Alcalde's hospitalization. *See id.* at 788 (denying summary judgment because "the Court is unable to say as a matter of law that defendant Hull did not

operate Memorial Hospital"). Thus, defendants' argument that Drs. Ruth and Mehta are not individually liable because they were not "in control of the policies or procedures concerning the use of interpreters," Dr. Ruth's Mot. Dismiss at 4, is not only inapt, but also premature, because plaintiff has not yet been afforded the opportunity to obtain discovery as to the role of Drs. Ruth and Mehta at Deaton/UMMS. Accordingly, defendants' motions to dismiss the § 504 claims against the individual doctors shall be denied.

## IV

None of defendants' arguments as to plaintiff's negligence and lack-of-informed-consent claims justifies the dismissal of those claims at this stage of the case. As explained below, and construing the amended complaint in favor of the plaintiff's allegations as I must, I am persuaded that plaintiff has stated claims under Maryland law for both negligence and lack of informed consent. Moreover, plaintiff has fully complied with the procedural requirements of the Maryland Health Care Malpractice Claims Act. Accordingly, defendants' motions to dismiss these claims shall be denied.

## A

Defendants contend that plaintiff has failed to state a claim for professional negligence because "[t]he Rehabilitation Act of 1973 was not created to establish a cause of action for medical malpractice." Dr. Mehta's Mot. Dismiss at 1. Ultimately, this contention may well require the entry of judgment in favor of defendants as to the professional malpractice claims, but I am persuaded that it would be premature to act on it at this stage.

Plaintiff's amended complaint contains four discrete claims: (1) violation of § 504 of the Rehabilitation Act; (2) intentional infliction of emotional distress; (3) negli-

---

**8.** In this regard, *Howe* was misinterpreted by the student author of the law review article

upon which defendants rely to support their argument.

gence; and (4) lack of informed consent. Plaintiff asserts insistently that the claims are separate and distinct and I shall so construe her allegations.

"The general principles which ordinarily govern in negligence cases also apply to medical malpractice claims under Maryland law. A *prima facie* case of medical malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard of care has been violated, and (3) develops a causal relationship between the violation and the harm complained of." *Waffen v. U.S. Dept. of Health & Human Serv.*, 799 F.2d 911, 915 (4th Cir.1986) (citations omitted). The amended complaint alleges that: (1) defendants "are governed by the Joint Commission on Accreditation of Health Care Organizations (hereafter "JCAHO") as well as state and federal law that require that they supply qualified sign language interpreters for effective communication," Amended Compl. ¶ 28; (2) defendants' "failure to provide communication services" and "removal of the tracheal shunt and other medical equipment relating to the shunt, i.e. ventilator" was a violation of the standard of care, *id.* ¶¶ 50–51; and (3) these acts "ultimately caused Ellen Alcalde to suffocate without any chance to communicate her distress to the Defendants[,] their agents, employees and representatives," *id.* ¶ 58.[9]

Giving the benefit of the doubt as to these allegations to plaintiff, i.e., that the Maryland law of professional malpractice recognizes a duty "to provide communication services" and it also recognizes a patient's concomitant right to "communicate ... distress" about an incipient medical condition (the deprivation of which can constitute a "harm" under the general law of negligence), I am constrained to deny

the motion to dismiss the professional malpractice claim. This claim will be better evaluated after discovery has been concluded.

## B

Defendants argue that plaintiff's claim for lack of informed consent is impermissibly vague and therefore fails to state a claim upon which relief can be granted. Defendants are mistaken. Plaintiff filed a detailed amended complaint in which she alleges, *inter alia,* that "Defendants failed to obtain informed consent from Ellen Alcalde for medical treatment during the 89 day hospitalization for treatments, procedures, and general medical care." Amended Compl. ¶ 79. More specifically, plaintiff alleges that defendants did not effectively communicate to Ms. Alcalde the reasons for her transfer to Union Memorial Hospital (where tracheal separation surgery was performed) on September 5, 1996, and that they also failed to obtain permission for and/or explain the removal of her ventilator tube on September 25, 1996. *See id.* ¶¶ 35, 40. Plaintiff's amended complaint clearly complies with the requirements of "notice pleading." *Conley,* 355 U.S. at 47, 78 S.Ct. 99. Defendants' motions to dismiss plaintiff's claim for lack of informed consent on the ground that it is impermissibly vague shall be denied.

## C

The Maryland Health Care Malpractice Claims Act ("the Act") requires litigants seeking redress for "medical injury" against a "health care provider" to submit their claims to an arbitration panel before they bring suit in Maryland courts. *See* Md.Code Ann., Cts. & Jud.

---

**9.** I am cognizant that these allegations very much appear to constitute an attempt at artful pleading. Nevertheless, I am not prepared at this stage of the case to conclude as a matter of law that the *only* source of the duty alleged to devolve upon a health care provider under Maryland law to afford "communication ser-

vices" to patients is the Rehabilitation Act itself. To the extent the Act is the source of any such duty, however, then defendants are correct in their argument that plaintiff has simply restated in professional malpractice verbiage her disparate treatment claim under the Act.

Proc. § 3–2A–02(a); *see also Oxtoby v. McGowan,* 294 Md. 83, 447 A.2d 860, 864–65 (1982) (clarifying that § 3–2A–02(a) creates a condition precedent to the institution of a court action). Initial jurisdiction of such claims lies with the Health Claims Arbitration Office of Maryland ("HCAOM"). *See Ralkey v. Minnesota Mining & Mfg. Co.,* 63 Md.App. 515, 492 A.2d 1358, 1360 n. 2 (1985). The Act also applies to medical malpractice claims filed in Maryland federal courts. *See Davison v. Sinai Hosp. of Baltimore, Inc.,* 462 F.Supp. 778 (D.Md.1978), *aff'd per curiam,* 617 F.2d 361 (4th Cir.1980).

Defendants argue that plaintiff's claim for lack of informed consent is precluded because plaintiff failed to submit her claim to HCAOM as required under Maryland law. This argument lacks merit. The HCA complaint specifically alleged, *inter alia,* that defendants "failed to obtain informed consent for countless medical procedures and tests." HCA Compl. ¶ 10. Defendants concede that this allegation was made, but argue that it was "buried" among numerous other allegations contained in Count I, labeled "Negligence." *See* Dr. Ruth's Reply Mem. at 4. Defendants contend that plaintiff was required to submit to HCAOM a distinct claim for lack of informed consent, but they do not cite to a single case in support of their position. Rather, defendants rely on *Brown v. Rabbitt,* 300 Md. 171, 476 A.2d 1167 (1984), which held that a litigant cannot evade arbitration by characterizing a medical malpractice claim as a claim for breach of contract. *Brown* is irrelevant here, as plaintiff does not deny that her claim for lack of informed consent was subject to arbitration. The only issue is whether the claim was presented to HCAOM. It was.

## D

 Defendants contend that plaintiff failed to submit a timely certificate of qual-

ified expert to HCAOM. The statute provides: "[A] claim filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint." Md.Code Ann., Cts. & Jud.Proc. § 3–2A–04(b)(1)(I). The statute does not define "qualified expert." *See id.* § 3–2A–01 (Definitions).

Plaintiff timely filed a certificate from Sheryl B. Cooper, Ph.D., attesting that defendants "did not comply with the standard of care expected of them in that they failed to provide equal access, in the form of sign language interpreters, as part of the services provided," and that "this discrimination and lack of communication resulted in diminished levels of care and treatment to the client which ultimately resulted in diminished quality of life during her final months of life and subsequently her death." Cooper Certificate at 1.

Defendants argue that Dr. Cooper is not a qualified expert because she is not a medical doctor. However, they offer no support for the contention that Dr. Cooper is not a qualified expert.[10] In fact, one of the cases cited by defendants held that "a person who has acquired sufficient knowledge in an area *should [not]* be disqualified as medical expert merely because [s]he is not a specialist or merely because [s]he has never personally performed a particular procedure." *Radman v. Harold,* 279 Md. 167, 367 A.2d 472, 475 (1977) (emphasis added). Dr. Cooper's 11–page curriculum vitae outlines her extensive experience with the deaf and expertise in sign language interpretation in a variety of scenarios, *including medical settings.* I am not persuaded that, as a matter of law, Dr. Cooper is not a qualified expert for purposes of the HCA certification require-

---

10. The cases cited by defendants not only fail to support their argument, but they predate this provision of the statute and thus do not arise under the Act. *But see infra.* n. 11.

ment.[11] Because her certificate was timely filed with HCAOM, defendants' motions to dismiss on this ground shall be denied.[12]

## V

▮ Defendants' motion shall be granted as to the claim for intentional infliction of emotional distress. In order to establish a *prima facie* case for this tort, a plaintiff must allege and prove facts showing that: (1) the conduct in question was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the conduct and the emotional distress; and (4) the emotional distress was severe. *See Harris v. Jones,* 380 A.2d 611, 614 (Md. 1977). It should be emphasized that in Maryland, "the tort of intentional infliction of emotional distress is rarely viable." *Farasat v. Paulikas,* 32 F.Supp.2d 244, 247 (D.Md.1997). Each element must be pled and proved with specificity. *See Foor v. Juvenile Serv. Admin.,* 78 Md.App. 151, 552 A.2d 947, 959 (1989). "It is not enough for a plaintiff merely to allege that they exist; he must set forth facts that, if true, would suffice to demonstrate that they exist." *Id.* (citations omitted). A complaint that fails to allege sufficient facts in support of each element must be dismissed. Thus, "as a deficiency in any one [element] is fatal, we need address only the first." *Id.*

▮ Maryland courts have regularly held that in order "[t]o meet the 'intentional or reckless' criterion of the first element, the plaintiff must allege and prove that the defendant either *desired* to inflict severe emotional distress, *knew* that such distress was *certain or substantially certain* to result from his conduct, or acted recklessly in deliberate disregard *of a high degree of probability* that the emotional distress will follow." *Id.* (emphasis in original) (citations omitted). In *Foor,* the plaintiffs alleged that the defendants' conduct was "intentional and/or negligent and constituted extremely outrageous conduct and [was] done intentionally and recklessly by Defendants without regard to the consequences to the Plaintiffs." *Id.* The court dismissed the complaint on the ground that the plaintiffs failed to set forth facts showing "animus." *Id.* In addition, the court distinguished the concept of "foreseeability" in intentional torts from that of negligence. It held that "to establish this intentional tort, the foreseeable consequence must be far more precise, for it is the achievement of that consequence, from which the distress is expected to arise, that lies at the heart of the tort." *Id.*

▮ In the instant case, the amended complaint fails to set forth facts which show animus. Instead, the amended complaint merely contains a conclusory statement that "Defendants acted maliciously, with intent to cause emotional distress and/or with reckless disregard for the probability of causing emotional distress." Amended Compl. ¶¶ 66, 73. Yet, plaintiff's amended complaint lacks a single specific fact demonstrating the existence of "malice" or "reckless disregard." As *Foor* pointed out, it is irrelevant that defendants may have foreseen the difficulties and frustration that Ms. Alcalde encountered as a result of their failure to provide sign language interpreters. Rather, the issue is whether defendants *desired* Ms. Alcalde to suffer severe emotional distress. *See Foor,* 552 A.2d at 959. Because plaintiff fails to set forth sufficient facts establishing the first element of the tort, I need not

---

**11.** Whether Dr. Cooper will *ultimately* qualify as an expert as to the (state-law) professional malpractice claims, in contrast to the (federal-law) disparate treatment claim, is an issue I need not and do not address at this time.

**12.** Defendants also argue that I should not consider an untimely filed second certificate of qualified expert. The second certificate was signed by Michael Schwarz, M.D., whose certificate was filed late because he was fighting a personal battle against cancer. I reject the contention that this untimely filing should be disregarded. *Cf. Larson v. Peninsula Medical Center,* 993 F.Supp. 373 (D.Md.1998).

consider whether the remaining elements have been factually supported. Plaintiff's claim for intentional infliction of emotional distress shall be dismissed with prejudice.

## VI

For the foregoing reasons, I shall dismiss the claim for intentional infliction of emotional distress and deny the motions to dismiss as to all other claims. An order follows.