**Elizabeth GUCKENBERGER,
et al., Plaintiffs,**

**v.**

**BOSTON UNIVERSITY; and Jon Westling, John Silber and Craig Klafter, in their official capacities, Defendants.**

**Civil Action No. 96–11426–PBS.**

United States District Court,
D. Massachusetts.

Jan. 28, 1997.

Frank J. Laski, Newton, MA, Sidney Wolinsky, Sid Wolinsky, Guy B. Wallace, Laurence W. Paradis, Disability Rights Advocates, Oakland, CA, William J. Hunt, William F. Ahern, Jr., Henry W. Clark, Clark, Hunt & Embry, Cambridge, MA, for Plaintiffs.

Lawrence S. Elswit, Office of General Counsel, Boston, MA, Michael B. Rosen, Office of General Counsel Boston University, Alan D. Rose, Alden D. Rose, Jr., Rose & Associates, Boston, MA, Erika Geetter, Boston University Office of General Counsel, for Boston University.

Lawrence S. Elswit, Office of General Counsel, Boston, MA, Michael B. Rosen, Office of General Counsel Boston University, Alan D. Rose, Alden D. Rose, Jr., Rose & Associates, Boston, MA, for Jon Westling, Craig Klafter.

Dale C. Kerester, Jager, Smith, Stetler & Arata, Boston, MA, for Loring Brinkerhoff.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *INTRODUCTION*

This is a proposed class action challenging the new policy adopted by defendant Boston University ("BU") to evaluate the requests of its students to accommodate their learning disabilities.[1] The plaintiffs—ten students with learning disabilities and four organiza-

---

1. Plaintiffs seek certification for a class consisting of

"[a]ll persons with learning disabilities and/or attention deficit disorder who have been, are, or will be denied their legal rights under the ADA, Section 504 of the Rehabilitation Act, or Article 114 of the Amendments to the Massachusetts Constitution as a result of Defendants' policies and practices, including

1) all students with learning disabilities already enrolled in Boston University or accepted to enroll on or after January, 1995;
2) all students who were enrolled at Boston University but have transferred as a result of new policies toward learning disabled students; and
3) all individuals with learning disabilities who were deter from applying to or enrolled in Boston University or will be so deterred in the future."

tions [2]—claim that the defendants [3] have violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., the Rehabilitation Act, 29 U.S.C. § 794, and state law. They seek injunctive, declaratory, and compensatory relief.

Plaintiffs challenge three aspects of BU's new policy as violative of state and federal anti-discrimination laws. First, they contend that BU has unreasonably erected a series of harsh eligibility requirements for students who seek accommodations for their learning disabilities, such as the requirement that all testing to document the disability must be no more than three years old and must be performed only by a licensed psychologist or a physician. Second, plaintiffs allege that BU has subjected the students' accommodation requests to an unfair evaluation and appeal procedure. Third, plaintiffs assert that the university has imposed a discriminatory blanket prohibition against course substitutions for mathematics and foreign language. In addition to the discriminatory treatment claims based on the university's new accommodations policy, plaintiffs allege that defendants have created a hostile learning environment for learning-disabled students, that the university has breached its contractual agreement to provide reasonable accommodations for such students, and that the named students with learning disabilities at BU have suffered severe emotional distress due to the university's intentional refusal to deliver on those promises.[4]

Plaintiffs now move for class certification. Defendants oppose plaintiffs' motion and, pursuant to Fed.R.Civ.P. 12(b)(6), move to dismiss a majority of the plaintiffs' eight claims, the four associational plaintiffs, and two of the named defendants. Defendants argue that the allegations of the complaint fail to support plaintiffs' claims for hostile environment discrimination (Count IV), breach of contract (Count V), promissory estoppel (Count VI), and intentional infliction of emotional distress (Count VII). Defendants also assert that the associational plaintiffs lack standing, and that defendants Silber and Klafter are improper parties. For the reasons set forth below, defendants' motion to dismiss is *ALLOWED IN PART* and *DENIED IN PART*, and plaintiffs' motion for class certification is *ALLOWED*.

## II. *FACTUAL ALLEGATIONS*

The allegations in the complaint that are relevant to the defendants' 12(b)(6) motion to dismiss and to the plaintiffs' motion for class certification are as follows.[5]

Boston University is a private institution of higher learning that is chartered and incorporated under the law of the state of Massachusetts. Prior to the 1995—1996 school year, students with learning disabilities who sought accommodations were required to provide BU's Learning Disabilities Support Services ("LDSS") with documentation of their disability. After reviewing the documentation, LDSS would determine which accommodations were appropriate. Authorized accommodations included tape-recorded textbooks, note-taking assistance, special testing

2. The Association on Higher Education and Disabilities ("AHEAD"); Children and Adults with Attention Deficit Disorders ("CHADD"); Orton Dyslexia Society ("ODS"); and Boston University Law Disability Caucus ("LDC").

3. Boston University; Jon Westling, current president of BU; John Silber, former president and current Chancellor or BU; and Craig Klafter, assistant to President Westling.

4. In summary, Counts I, II, and III accuse the defendants of violating plaintiffs, rights under the ADA, Section 504 of the Rehabilitation Act, and Article 114 of the Massachusetts Constitution, respectively. Count IV claims that defendants have created a hostile learning environment for students with learning disabilities. Count V alleges that defendants breached a contract with plaintiffs; Count VI claims that plaintiffs are entitled to relief under a theory of promissory estoppel, Finally, Count VII asserts that defendants intentionally inflicted emotional distress upon the plaintiffs named in this lawsuit.

5. In deciding this motion to dismiss pursuant to Rule 12(b)(6), the Court looks only at the allegations contained within the complaint, and does not consider any additional facts alleged in the parties' memoranda or exhibits. *See Canney v. City of Chelsea*, 925 F.Supp. 58, 63 (D.Mass. 1996) ("The crucial inquiry on a motion to dismiss is whether, based on the allegations of the complaint at issue, the plaintiff is entitled to offer evidence support of his claims."); *accord Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

accommodations, reduced course loads, and course substitutions for the mathematics and foreign language requirements. In its promotional materials, BU represented its commitment to accommodating learning-disabled students and stated that the services and accommodations provided by LDSS would be available throughout the academic career of a student with a documented learning disability.

During the 1995—1996 school year, 480 students with learning disabilities were enrolled at BU. Yet, as in prior years, only a small percentage of the total number of learning disabled students asked for and received an accommodation for their disabilities. For example, from 1990 to 1995, BU allowed an average of 15 students per year to accommodate their disabilities by substituting other courses for math and foreign language.

In December of 1995, just prior to final exams, certain BU students with learning disabilities were sent a letter from LDSS notifying them of a new policy regarding their eligibility for accommodations. Students were told that their medical documentation had to have been completed within the preceding three years by a licensed psychologist or a physician "of reputable practice," and that they had until January 8, 1996 to submit test results that satisfied this new criteria if they were to remain eligible for accommodations. BU extended the deadline for submission of new documentation to August 31, 1996 in a letter dated December 22, 1995; however, other aspects of the university's new policy went into effect during the 1995—1996 school year, including its revised evaluation procedure.

Under the new evaluation scheme, a request for accommodation that has been submitted by a student with a learning disability is subjected to several tiers of review. A student is required, first, to submit to LDSS a recent physician's or psychologist's report. LDSS reviews the documentation, makes a recommendation regarding the student's request, and forwards the application to the president's office. BU's president, currently Jon Westling, then reviews the application *de novo*. When this reevaluation is complete, the president's office notifies LDSS of the chief administrator's decision, and LDSS notifies the student of the university's position regarding accommodations for the student's disability. There is no avenue of appeal for students whose applications for accommodation have been denied by the president.[6] Most significantly, under the new policy, a student with a learning disability will not be accommodated with a course substitution of any kind under any circumstances.

President Westling, who has no expertise in learning disabilities or accommodations, is the final arbiter of student requests under the new policy. He personally denied twenty-six out of twenty-seven student requests for accommodation under the university's new evaluation procedure during the 1995—1996 school year. Several students were denied access to the same accommodations that they had been receiving from the university prior to the implementation of the new policy.

Moreover, in two speeches, delivered in Australia and before the Heritage Foundation in Washington, D.C., President Westling referred to students with learning disabilities as "a plague," and an indication of "a silent genetic catastrophe," and he has made similar statements in letters to the New York Times, the Boston Globe, campus newspapers, and students' parents. Other administrators at BU, including Westling's assistant, Craig Klafter, have also made derogatory comments, such as referring to students with learning disabilities as "draft dodgers."

Students with learning disabilities at BU subjectively perceive the university to be a hostile educational environment for the learning-disabled. Plaintiffs claim they have suffered a loss of educational and professional opportunity, and their physical, mental, and emotional well-being has been irreparably harmed.

---

6. BU retorts that the president's denial is reviewable by a subordinate university official. Even if such a review constitutes an effective appeal right, the Court assumes for the purpose of this motion that plaintiff's allegation is correct.

## III. *MOTION TO DISMISS*

### A. *Dismissal of Claims*

"Like a battlefield surgeon sorting the hopeful from the hopeless, a motion to dismiss invokes a form of legal triage, a paring of viable claims from those doomed by law." *Iacampo v. Hasbro Inc.*, 929 F.Supp. 562, 567 (D.R.I.1996). The standard for dismissal of claims under Federal Rule of Civil Procedure 12(b)(6) is clear: a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *accord Roma Constr. Co. v. aRusso*, 96 F.3d 566, 569 (1st Cir.1996). Although the court must take the factual averments of the complaint as true and draw all reasonable inferences in favor of the plaintiff, *see Coyne v. City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.1992), it is not required to "accept every allegation made by the complainant[ ] no matter how conclusory or generalized." *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir.1992). "'[E]mpirically unverifiable' conclusions, not 'logically compelled, or at least supported, by the stated facts,' deserve no deference." *Id.* (quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989)).

### 1. *Hostile Learning Environment (Count IV)*

█ Plaintiffs contend that the defendants' derogatory speeches and discriminatory conduct have created a "hostile learning environment" for BU students with learning disabilities in violation of the ADA and the Rehabilitation Act. Cmplt. ¶ 76. Although several district courts have held that *workplace* harassment of a disabled employee violates federal law, *see e.g., Gaither v. Barron*, 924 F.Supp. 134, 136 (M.D.Ala.1996); *Davis v. York Int'l, Inc.*, 1993 WL 524761, at *9 (D.Md.1993); *Easley v. West*, 1994 WL

702904, at *7 (E.D.Pa.1994), only one federal court appears to have allowed a student to bring a hostile *educational* environment claim under the ADA or the Rehabilitation Act. *See Gaither*, 924 F.Supp. at 137 (using Title VII's hostile work environment theory to analyze a harassment claim brought by a disabled student). The threshold issue in ruling on defendants' motion to dismiss the plaintiffs' hostile learning environment claim is whether such a cause of action exists under the federal laws prohibiting discrimination against persons with disabilities.

The analysis begins, of course, with the statutory language. *See Bailey v. United States*, —— U.S. ——, ——, 116 S.Ct. 501, 504, 133 L.Ed.2d 472 (1995). Title III of the Americans with Disabilities Act, 42 U.S.C.A. § 12182 (1988), provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. . . ." The Rehabilitation Act, 29 U.S.C.A. § 794(a) (as amended 1992), states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Both statutes apply to discrimination by educational facilities in receipt of federal funds, *see* 42 U.S.C. § 12181(7)(J) *and* 29 U.S.C. § 794(b)(2)(A), and neither limits its prohibitions to discrimination in the employment context.

The language of both Title III of the ADA and Section 504 of the Rehabilitation Act is substantially similar to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88 (1988),[7] which courts have held is the statutory basis for hostile learning environment claims based on sexual harassment. *See, e.g., Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 75, 112 S.Ct. 1028, 1037–38, 117 L.Ed.2d 208 (1992) (holding that the analysis in *Meritor Sav. Bank, FSB v. Vin-*

---

7. In relevant part, Title IX provides:
 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance. . . .

20 U.S.C. § 1681(a) (1988).

*son,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986), applies to claims of sexual harassment under Title IX); *Seamons v. Snow,* 84 F.3d 1226, 1232 (10th Cir.1996) (finding a "sexually charged hostile environment cognizable as sexual harassment" under Title IX); *see also Brown v. Hot, Sexy and Safer Productions, Inc.,* 68 F.3d 525, 539 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996); *Davis v. Monroe County Board of Educ.,* 74 F.3d 1186 (11th Cir.1996), *vacated pending reh'g en banc,* 91 F.3d 1418 (11th Cir.1996); *Bruneau v. S. Kortright Cent. Sch. Dist.,* 935 F.Supp. 162, 172 (N.D.N.Y.1996); *Burrow v. Postville Community Sch. Dist.,* 929 F.Supp. 1193, 1205 (N.D.Iowa 1996).

Persuaded by this line of cases interpreting the analogous language and policies of Title VII and Title IX, I conclude there is a cause of action under the ADA and the Rehabilitation Act for a hostile learning environment when harassment based on a student's disability has "the purpose or effect of unreasonably interfering with [the] individual's performance or [of] creating an intimidating, hostile, or offensive environment." *Brown,* 68 F.3d at 540. This conclusion is consistent with the express congressional purpose in enacting the ADA to "address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b) (1988) (ADA congressional statement of findings and purposes); *cf. Doe v. Marshall,* 882 F.Supp. 1504, 1507 (E.D.Penn. 1995) (finding that harassment of a student by a professor on the basis of her disability would "fall[ ] within the ambit" of the ADA and the Rehabilitation Act). Harassment based on disability is no less potent, disruptive, or discriminatory on a university campus or in a classroom than on an assembly line or in a boardroom. *See Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 74–75, 112 S.Ct. 1028, 1037, 117 L.Ed.2d 208 (1992) ("[A] student should have the same protection in school that an employee has in the workplace.")

■ This Court concludes, further, that the flexible Title VII standards for establishing a hostile work environment claim apply to hostile learning environment claims brought under the federal statutes prohibiting discrimination against persons with disabilities. *Brown,* 68 F.3d at 540 (applying Title VII caselaw by analogy to a hostile learning environment claim brought under Title IX); *but cf. Rowinsky v. Bryan Indep. Sch. Dist.,* 80 F.3d 1006, 1011 n. 11 (5th Cir.1996) (noting that "importing a theory of discrimination from the adult employment context into a situation involving children is highly problematic"), *cert. denied,* —— U.S. ——, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996).

■ To state a cognizable claim for hostile learning environment harassment under the ADA and Rehabilitation Act, a plaintiff must allege: (1) that she is a member of a protected group, (2) that she has been subject to unwelcome harassment, (3) that the harassment is based on a protected characteristic, her disability, (4) that the harassment is sufficiently severe or pervasive that it alters the conditions of her education and creates an abusive educational environment, and (5) that there is a basis for institutional liability. *See Brown,* 68 F.3d at 540 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–73, 106 S.Ct. 2399, 2405–09, 91 L.Ed.2d 49 (1986)).

Applying these standards, this Court must now decide whether the claim of hostile learning environment discrimination in this case passes muster. Here, the individual plaintiffs are BU students with learning disabilities who claim that the derogatory statements of university administrators, in particular, President Westling, combined with the university's "draconian" new accommodations policy, has created an abusive learning environment that has altered their educational and professional opportunities.

■ "[T]he relevant factors must be viewed both objectively and subjectively." *Brown,* 68 F.3d at 540. "[T]o state a hostile environment claim for discrimination by unlawful harassment, a plaintiff must show that the alleged harassment creates an objectively hostile or abusive ... environment and that the putative victim subjectively perceives the environment to be abusive." *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092, 1107 (S.D.Ga.1995); *accord Harris v. Forklift Systems,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 370,

126 L.Ed.2d 295 (1993). Under well-established Title VII precedent, harassment is actionable as illegal discrimination only if the environment is "permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris,* 510 U.S. at 21, 114 S.Ct. at 370 (quoting *Meritor Sav. Bank,* 477 U.S. at 64–65, 106 S.Ct. at 2404–05). In evaluating a complaint pursuant to a motion to dismiss a hostile environment claim, a court should consider the "totality of the circumstances," including the frequency of the discriminatory conduct, its severity, whether the alleged conduct is "physically threatening or humiliating rather than a mere offensive utterance," and whether it interferes with the plaintiff's performance. *Brown,* 68 F.3d at 540.

■ The allegations of the complaint fall short of describing an objectively "hostile" educational environment for students with learning disabilities. Jon Westling's speeches, which are the only concrete examples of the alleged expressions of "scorn and hostility" toward learning disabled students made by university administrators, were delivered on only two occasions, both off-campus and in nonstudent fora.[8] When read in context,[9] the statements are critiques of the learning disabilities "movement" that are not focused on or addressed to particular BU students. For example, in the speech "Disabling Education: The Culture Wars Go to School," Westling explores what he identifies as "the distinction between learning disabilities *per se* and [the] ideological movement that has seized on the existence of some real disabilities and conjured up other[s]":

> We should, in my view, make a strong distinction between diagnoses that rest on clear, specific criteria and corroborating medical and epidemiological evidence, and the penumbra complaints. The latter, much larger category of alleged maladies

comprises much of the repertoire of learning disabilities specialists....

These are, it is fair to say, fugitive disorders. For most of them there is no standard test. Their symptomatologies are as vague as those photographs taken of bank robbers by surveillance cameras. That is to say, they do occasionally identify a suspect, but more often they identify a blur. Mostly what these fugitives disorders lack is a grounding in careful medical or scientific inquiry....

What, then, ails the fifteen to twenty percent of the school-age population that is allegedly learning disabled? ... Between 1977 and 1982, the number of learning disabled students in the United States more than doubled (from 797,000 to 1,627,-000). What happened? Did America suffer some silent genetic catastrophe during those decades?

Although these comments, viewed objectively, may certainly be offensive to learning-disabled students, under the *Brown* standard, they are not physically threatening or humiliating. *See Brown,* 68 F.3d at 541 (finding conduct insufficiently severe, threatening, or humiliating where the "remarks were not directed specifically at plaintiffs" and were intended to educate).

The complaint is devoid of the sharply-pointed, crudely-crafted, and frequently-launched "slings and arrows" that courts have found sufficient to establish severe and pervasive harassment that alters a plaintiff's working conditions. *See e.g., Harris,* 510 U.S. at 19–20, 114 S.Ct. at 369 (describing allegations of gender-based insults, statements that made plaintiff "the target of unwanted sexual innuendos," and orders by supervisor that plaintiff retrieve coins from his front pants pocket and bend over to pick up items intentionally dropped); *Burrow v. Postville Community Sch.,* 929 F.Supp. 1193,

---

**8.** The complaint references statements from two speeches, "Getting the Government Out of Higher Education," and "Disabling Education: The Culture Wars Go to School," which were given in 1995 in Australia and at a Heritage Foundation meeting in the District of Columbia. Although the plaintiffs allege generally that "[o]ther Boston University administrators, including Defendant Klafter, have made similar discriminatory public statements," they do not allege facts pertaining to statements made by any administrator other than Westling.

**9.** The First Circuit has suggested that, in deciding a motion to dismiss a hostile environment claim, a court can consider the context and content of allegedly abusive statements. *See Brown,* 68 F.3d at 541.

1198 (N.D.Iowa 1996) (recounting classmates' acts of yelling sexual obscenities at plaintiff, throwing food and spit balls at her, kicking her between the legs in a sexually suggestive manner, threatening her life, and defacing her locker and materials with sexually offensive threats); *Haysman v. Food Lion, Inc.,* 893 F.Supp. at 1098 (describing the supervisors' threatening and berating attitudes and statements, extreme profanity, and physical assaults on the disabled plaintiff); *Davis v. York Int'l, Inc.,* 1993 WL 524761, at *10 (D.Md.1993) (assessing disabled plaintiff's allegations that her supervisor mocked her speech and gait, spread myths and rumors about her condition, blamed her for other workers' errors, hovered over her excessively while she worked, threatened to remove her equipment, and denigrated her abilities privately and publicly).

One court in this district has recently held that "there is enough difference between the work and the school milieu to justify a less rigorous" threshold of offensive conduct when plaintiffs claim that sexual harassment has created a hostile educational environment than when plaintiffs seek to support a hostile workplace sexual harassment claim. *Donovan v. Mt. Ida College,* No. 96–10289 (D.Mass.1997). Even if the measure of harassment in the educational environment is less rigorous than Title VII's requirement of "severe and pervasive" conduct, the activity alleged in this complaint would miss the hostile environment mark.

Holding a university president liable for creating a hostile learning environment solely because of an unpopular speech would also have serious First Amendment implications. *See Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 351 (1st Cir.1989) (holding that it was error to permit the speeches of a university president to be admitted as evidence of discriminatory animus because of the "chilling effect that admission of such remarks could have on academic freedom"), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990); *cf. Sweezy v. State of*

*N.H.,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957) (concluding that "to impose any straitjacket upon the intellectual leaders in any colleges and universities would imperil the future of our nation"). The fact that a vociferous administrator with a concern about a perceived abuse of learning-disability protections is personally involved in the day-to-day implementation of the university's allegedly discriminatory accommodations policy may be of some consequence in this Court's determination of the fairness of BU's evaluation procedures. However, insensitive or politically incorrect speeches by high ranking university officials do not transform a cognizable discriminatory treatment claim into an action for hostile environment discrimination.

Assuming *arguendo* that one can state a hostile learning environment claim under Article 114 of the Amendments to the Massachusetts Constitution,[10] plaintiffs' allegations would also fail to support such a claim. *See Layne v. Superintendent of Mass. Correctional Inst.,* 406 Mass. 156, 159, 546 N.E.2d 166, 168 (1989) (finding that "assistance in construing art. 114" can be found in case law that interprets the Rehabilitation Act "from which the language of the amendment was largely taken").

Accordingly, Count IV is *DISMISSED.*

### 2. Breach of Contract (Count V)

■ A breach of contract is a failure to perform the terms of an agreement without legal excuse. *See Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,* 825 F.Supp. 370, 380 (D.Mass. 1993), *modified,* 57 F.3d 56 (1st Cir.1995), *and cert. denied,* —— U.S. ——, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995). To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage. *See Arthur D. Little Int'l, Inc. v. Dooyang Corp.,* 928

---

**10.** Article 114 provides:

"No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth."

Mass. Const. amend. art. CXIV.

F.Supp. 1189, 1201 (D.Mass.1996); *Loranger Const. Corp. v. E.F. Hauserman, Co.*, 1 Mass.App.Ct. 801, 801, 294 N.E.2d 453, 454 (1973).

■ Plaintiffs allege that BU "published and disseminated various brochures, catalogues, and promotional materials" that described accommodations that students with learning disabilities are eligible to obtain, including course substitutions in math and foreign language. Cmplt. at ¶ 84. Plaintiffs also assert that the published materials assured learning disabled students that "the services and accommodations provided by LDSS would remain available for the remainder of the student's academic career at BU," and that these promises were a "significant factor" in the students' decisions to attend the university. *Id.* at ¶¶ 84, 85. The complaint alleges that the promotional materials created a contract between the students with learning disabilities and the university, and that the university breached this agreement by prohibiting course substitutions in math and foreign language and by requiring retesting for continued eligibility for accommodations, among other things. *Id.* at ¶ 87. This Court concludes that plaintiffs have alleged facts that, if true, are sufficient to support its breach of contract claim.

■ Universities are capable of forming legally cognizable contractual relationships with their students. *See Russell v. Salve Regina College*, 890 F.2d 484, 488 (1st Cir. 1989), *rev'd on other grounds*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), *and reinstated on remand*, 938 F.2d 315 (1st Cir.1991). Brochures, policy manuals, and other advertisements can form the basis of such contractual agreements. *See id.* (discerning the terms of an agreement between a nursing student and a college "[f]rom the various catalogs, manuals, handbooks, etc., that form the contract between student and institution"); *see also Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 822, 434 N.E.2d 611, 617 (1982) ("We have no

doubt that express warranties can be created by an advertising brochure.").

Nonetheless, the defendants argue that the Court should exercise extreme care in deciding that the BU's relationship with its learning disabled students is subject to commercial contract doctrine. Although "there can be no doubt that courts should be slow to intrude into the sensitive area of the student-college relationship," *Russell*, 890 F.2d at 489, plaintiffs have alleged sufficient facts to establish a contract between BU and its students with learning disabilities and to support their allegation of breach. *See id.* at 488; *see also Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir.1977) ("[S]ome elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the university ...." (quoting *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir.1975))), *cert. denied.* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978).

Defendants' argument that the university has issued materials with a disclaimer statement which undermines the plaintiffs' breach of contract claim presents matters outside the four corners of the complaint and must await the summary judgment stage.

The motion to dismiss Count V of the complaint is *DENIED*.

### 3. *Promissory Estoppel (Count VI)*

■ Plaintiffs allege that defendants made oral promises to certain students with learning disabilities regarding their eligibility for accommodations, and that those students relied on the defendants' representations. Although the complaint alleges facts sufficient to state a promissory estoppel claim, the standstill agreement[11] to honor any oral promise that university representatives may have made to learning-disabled students renders the promissory estoppel allegation moot. *See Griffith v. Sullivan*, 987 F.2d 25, 27 (1st Cir.1993) (dismissing an appeal as moot because plaintiff had received everything that he claimed he was entitled to recover).

**11.** The University has agreed to hold certain aspects of the challenged policy in abeyance during the 1996–1997 school year, and to honor students' claims that they were promised an accom-

modation if such promise is verified by the promisor. Because the standstill agreement was filed in court, I take judicial notice of its provisions.

Count VI is **DISMISSED** without prejudice to the claim of any student who alleges that, despite the agreement, the oral promises were not honored, and without prejudice to plaintiffs' claims that they relied on the written representations that appear in BU's promotional materials, if the breach of contract count ultimately should fail.

4. *Intentional Infliction of Emotional Distress (Count VII)*

 To state a claim for intentional infliction of emotional distress under Massachusetts law, the plaintiff must allege

(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community"; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was "severe" and of a nature "that no reasonable man could be expected to endure it."

*Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45, 355 N.E.2d 315, 318–19 (1976) (citations omitted); *accord Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir.1995) (following the *Agis* standard). It is well-established that, in regard to claims of intentional infliction of emotional distress, "the door to recovery should be opened but narrowly and with due caution." *Agis*, 371 Mass. at 144, 355 N.E.2d 315 (quoting *Barnett v. Collection Serv. Co.*, 214 Iowa 1303, 1312, 242 N.W. 25, 28 (1932)). Simply stated, "liability is imposed only where the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 380 (1st Cir.1991); *see also Foley v. Polaroid Corp., Inc.*, 400 Mass. 82, 99, 508 N.E.2d 72, 82 (1987) (quoting Restatement (Second) of Torts, § 46, comment d (1965)).

 This is not such a case. Plaintiffs claim emotional distress based on the defendants' imposition of an allegedly discriminatory accommodations policy and on the creation of an allegedly hostile environment for students with learning disabilities. Even when taken as true, the factual allegations of the complaint are not extreme and outrageous enough to give rise to liability for any resulting emotional distress. *Cf. Chakrabarti v. Cohen*, 31 F.3d 1, 6 (1st Cir.1994) (finding that "[l]awyers, who use the term 'outrage' liberally, may become tone-deaf to the nuances" but that "an atrocity is something more than a faulty evaluation").

Plaintiffs argue that the defendants' conduct was sufficiently outrageous because the defendants knew that students with learning disabilities are particularly susceptible to emotional injury. While "the relationship of the plaintiff to the defendant and the knowledge of the plaintiff's sensitivities" is an important consideration in determining whether the challenged conduct satisfies the "extreme and outrageous" conduct requirement, *Russell*, 890 F.2d at 487 (citing Prosser and Keeton, *The Law of Torts*, § 12, at 64 (5th ed.1984)). vulnerable plaintiffs do not state an emotional distress claim solely by demonstrating that the defendants were aware of the plaintiffs' susceptibility to emotional injury when they acted. *Cf. Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1021 (1st Cir.1988) ("[C]onduct that is intentional or reckless and causes severe emotional distress does not *ipso facto* constitute extreme and outrageous conduct."), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988); *Foley*, 400 Mass. at 99, 508 N.E.2d at 82 (finding that liability for emotional distress cannot be based upon the tortious, criminal, or malicious intent of the defendant; rather, it is permitted only where the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" (internal quotation marks and citation omitted)). Although it is a fair inference from the allegations in the complaint that BU's administrators knew that students with learning disabilities were likely to be upset by the new accommodations procedure, the conduct is insufficiently extreme and outrageous as a matter of law to state a claim for intentional infliction of emotional distress.

Moreover, the mere fact that the defendants' conduct may turn out to be violative of the plaintiffs' civil rights does not, in and of itself, necessitate a finding that the conduct is sufficiently egregious to state a claim for intentional infliction of emotional distress. *See e.g., Marques v. Fitzgerald*, 99 F.3d 1, 6–7 (1st Cir.1996) (concluding that a reasonable jury may have found that the defendant's conduct violated the state whistleblower statute, but that the conduct nonetheless was insufficiently extreme and outrageous to support liability for intentional infliction of emotional distress).

The intentional infliction of emotional distress claim (Count VII) is *DISMISSED*. *See Fudge*, 840 F.2d at 1021 (affirming the dismissal of an emotional distress claim where the "facts do no allege conduct that is sufficiently extreme and outrageous to warrant the imposition of liability"); *Hoffman v. Optima Systems, Inc.*, 683 F.Supp. 865, 872–73 (D.Mass.1988) (dismissing emotional distress claim as based on conduct that is legally insufficient).

### B. *Dismissal of Parties*

Defendants assert that the associational plaintiffs should be dismissed as parties in this action for lack of standing, and that former BU President John Silber and Assistant President Craig Klafter should be dismissed because there is no basis in law or fact to include them as defendants.[12]

### 1. *Associational Plaintiffs*

Four organizations have joined as plaintiffs in this litigation: the Association for Higher Education and Disabilities ("AHEAD"), Children and Adults with Attention Deficit Disorder ("CHADD"), the Orton Dyslexia Society ("ODS"), and the Boston University Law Disability Caucus ("LDC"). AHEAD, which has 2,000 institutional, professional, and student members, is a non-profit organization designed to promote equal access to higher education for people with disabilities. CHADD, with 35,000 members, and ODS, with 10,000 members, are nationwide, nonprofit associations formed to better the lives and further the educational and professional opportunities of persons with attention deficit disorder and dyslexia, respectively. LDC, which was formed incident to the events that triggered the instant lawsuit, is an association consisting of approximately ten learning-disabled BU law students who seek to ensure that the university abides by the federal laws prohibiting discrimination against people with disabilities.

According to the complaint, the membership of each organization "includes persons who are students or would be potential students of Boston University." In addition, the complaint alleges that each organization "has been, and will be, forced to expend its resources in order to counter the discriminatory acts of the Defendant." At issue here is whether the allegations of the complaint are sufficient to establish that any of these organizations has standing, either on its own behalf or as a representative of the students, to bring this action.

### a. *Standing Standard*

 An association may have standing both to seek redress for injury to itself and/or to vindicate harm to its members. *See Int'l Union, United Auto., Aerospace and Agr. Implement Workers of America v. Brock*, 477 U.S. 274, 281, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986); *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). To have standing to sue on its own behalf, an organization must show that it satisfies the following prerequisites: "(1) [it] personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can be fairly traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court." *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir.1996) (setting forth the criteria that a party seeking federal jurisdiction must meet "[t]o clear the Article III

**12.** The defendants also sought dismissal of plaintiffs Freedman and LaBraque, students whose claims against BU for injunctive and declaratory relief were allegedly mooted by their transfer to a different university. The plaintiffs concede that these students claims are moot. Thus, the Court allows defendants' motion to dismiss the two plaintiffs.

hurdle"); *see also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982) ("conduct[ing] the same inquiry as in the case of an individual" in determining whether an association has standing in its own right).

To have standing to sue as a representative of its members, an organization must establish that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *accord United States v. AVX Corp.,* 962 F.2d 108, 116 (1st Cir.1992).

In either case, for the organization to have standing to sue, the association itself or its members must face real, tangible harm: "[a] mere interest in an event—no matter how passionate or sincere the interest and no matter how charged with public import the event—will not substitute for an actual injury." *AVX Corp.,* 962 F.2d at 108; *see also Diamond v. Charles,* 476 U.S. 54, 62, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986). It is the organizational plaintiff's responsibility to allege such a cognizable injury, for "the burden of adducing facts necessary to support standing rests squarely with the party seeking to avail itself of federal jurisdiction." *AVX Corp.,* 962 F.2d at 114.

### b. *AHEAD, CHADD, ODS*

In the complaint, plaintiffs assert that these organizations expect to expend resources to challenge BU's accommodations policy. Even if BU's new procedure has such an indirect economic impact on these associations, this fact is not sufficient to establish that AHEAD, CHADD, and ODS have suffered a redressible injury and, thus, have standing to challenge the defendants' allegedly discriminatory accommodations policies on their own behalf. *See Warth v. Seldin,* 422 U.S. 490, 508–510, 95 S.Ct. 2197, 2209–2211, 45 L.Ed.2d 343 (1975) (rejecting taxpayers' argument that they had standing to sue a municipality because measures taken to rectify a neighboring town's discriminatory housing policy increased the city's tax burden). The argument that BU's discrimination against learning-disabled students causes AHEAD, CHADD, and ODS to spend money and thus gives them standing to sue in their own right "falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Warth,* 422 U.S. at 509, 95 S.Ct. at 2210.

In their memorandum in opposition to the motion to dismiss, plaintiffs assert that AHEAD, CHADD, and ODS have standing to sue on their own behalf not only because of the expected expenditures but also because the referral functions of the organizations have been injured by the need to "provid[e] increased information to their memberships and the general public" as a result of BU's discriminatory policy. *Cf. Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982) (concluding that an organization had standing in its own right because the complaint stated that, in addition to the depletion of resources, the organization's counseling and referral services had been "frustrated" by the racial steering practices of the defendant). No such allegation of injury appears within the four corners of the complaint. *See Canney v. City of Chelsea,* 925 F.Supp. 58, 63 (D.Mass.1996) (establishing that "[a] motion to dismiss tests the legal sufficiency of the complaint").

Alternatively, plaintiffs argue that AHEAD, CHADD, and ODS have standing to sue as representatives of their members. However, the complaint asserts only that each organization's membership "includes persons who are students or who would be potential students of Boston University." The complaint does not allege—as it must—that the "members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth,* 422 U.S. at 512, 95 S.Ct. at 2211–12;

*see also United States v. AVX Corp.,* 962 F.2d 108, 116 (1st Cir.1992) (concluding that the critical inquiry is whether the organization has "alleged an injury to a member sufficient to meet the requirements of Article III"). There is no allegation that any of the student members seek accommodations for their learning disabilities or are affected (or likely to be affected) adversely by any of the alleged illegal policies. The allegation that AHEAD, CHADD, and ODS have members who are or would be potential BU students, even if true, is simply insufficient to establish that the members would have standing to sue in their own right, an essential element of representational standing. *Cf. Aikins v. St. Helena Hospital,* 843 F.Supp. 1329, 1334 (N.D.Cal.1994) (dismissing the claims brought by an association because the allegation that some members "have been or likely will be served by defendants" was not sufficient to satisfy the requirements of associational standing).

### c. *LDC*

 Unlike the other associational plaintiffs, LDC meets the three prongs of the *Hunt* test for representative standing. First, the complaint alleges that LDC consists of approximately ten "students with learning disabilities who attend Boston University School of Law." Cmplt. ¶ 23. Because at least one named plaintiff is a member of LDC, the organization has members who are subject to the university's allegedly discriminatory accommodations policies and who, thus, would have standing to sue in their own right.

Second, inasmuch as the complaint asserts that "the major priority of [LDC] is to ensure that federal laws which protect students with disabilities are enforced by Boston University," the organization's purpose is consistent with the interests that the lawsuit seeks to protect.

Finally, the primary forms of relief sought—injunctive and declaratory relief against BU's implementation of its new accommodations policy—do not require the individual participation of LDC members. This is a proper case for associational stand-ing. *See Warth,* 422 U.S. at 515, 95 S.Ct. at 2213 (finding that where "the association seeks a declaration, injunction, or some other form of prospective relief, it reasonably can be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured," and thus, that the association can represent those members in seeking these forms of relief).

### 2. *John Silber and Craig Klafter*

The complaint asserts ADA, Rehabilitation Act, Article 114, and breach of contract claims against Boston University and against John Westling, John Silber, and Craig Klafter in their official capacities.[13] Defendants have moved to dismiss individual defendants Silber and Klafter.

### a. *ADA Claims Against Silber and Klafter*

The threshold inquiry in determining whether defendants Silber and Klafter should be dismissed is whether and under what circumstances individuals are liable for discrimination under Title III of the ADA, the statutory basis for the plaintiffs' claims against Silber and Klafter. Title III provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation *by any person who owns, leases (or leases to), or operates a place of public accommodation.*

42 U.S.C.A. § 12182 (1995) (emphasis added). Although the language of the statute explicitly refers to "persons," the regulations that implement this statutory section "place[ ] the ADA's nondiscrimination obligations on 'public accommodations' rather than on 'persons' or on 'places of public accommodation.'" 28 C.F.R.App. B § 36.104, at 606 (1996). The regulations "alter the language of the statute slightly to read as follows: 'No individual shall be discriminated against on the basis of disability ... *by any private entity* who owns, leases (or leases to), or operates a

---

**13.** Plaintiffs do not seek compensatory damages from these individual defendants.

place of public accommodation.'" *Aikins v. St. Helena Hosp.*, 843 F.Supp. 1329, 1335 (N.D.Cal.1994) (quoting 28 C.F.R. § 36.201(a) (1993) (emphasis added)). Nonetheless, these regulations simultaneously define a "private entity" to include an individual "if she owns, leases (or leases to), or operates a place of public accommodation." 28 C.F.R.App. B § 36.104, at 606.

Nearly every court that has decided the issue of individual liability under Title III has found that individuals can be held responsible for violations of these prohibitions against discrimination "if they 'own, lease[ ] (or lease[ ] to), or operate[ ]' a place of public accommodation." *Aikins*, 843 F.Supp. at 1335 (quoting 42 U.S.C. § 12182(a); 28 C.F.R.App. B. § 36.104 (1993)); *accord Atakpa v. Perimeter Ob–Gyn Assoc., P.C.*, 912 F.Supp. 1566, 1574 n. 5 (N.D.Ga.1994); *Howe v. Hull*, 874 F.Supp. 779, 787–788 (N.D.Ohio 1994); *United States v. Morvant*, 843 F.Supp. 1092, 1094 (E.D.La.1994); *Glanz v. Vernick*, 756 F.Supp. 632, 637 (D.Mass.1991); *but see Simenson v. Hoffman, M.D.*, 1995 WL 631804, \*4–\*5 (N.D.Ill.1995) (finding that "there is no individual liability under Title III of the ADA" because this statute only pertains to "private entities"). The statute specifically provides for preventive relief against such an owner, lessor, or operator. *See* 42 U.S.C. § 12188(a)(1) (1995) [14]; *see also Aikins*, 843 F.Supp. at 1335 (noting that this interpretation the ADA "retains accountability for those in a position to ensure nondiscrimination").

The question remains, however, whether the plaintiffs in this case have alleged facts sufficient to establish that defendants Silber and Klafter "operate" BU within the meaning of the statute, and are, thus, liable for violations of the ADA.

■ In *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063 (5th Cir.1995), the Fifth Circuit relied upon commonly understood definitions of the term "operate" to determine whether a franchisor with limited control could be held liable under Title III of the ADA as the "operator" of a discriminatory franchise. *Id.* at 1066 (finding that "[b]ecause the ADA does not define the term," it must be construed within " 'its ordinary and natural meaning' " (quoting *Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993))), *cert. denied*, —— U.S. ——, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996). The Circuit court found that:

> To "operate," in the context of a business operation, means "to put or keep in operation," *The Random House College Dictionary* 931 (Rev. ed.1980), "to control or direct the functioning of," *Webster's II: New Riverside University Dictionary* 823 (1988), "to conduct the affairs of; manage," *The American Heritage Dictionary* 1268 (3d ed.1992).

*Id.* Similarly, in *Howe v. Hull*, 874 F.Supp. 779 (N.D.Ohio 1994), a federal court found that the word "operate" "implies the performance of some sort of function, in conjunction with a degree of sanctioned authority." *Id.* at 787. The *Howe* court went on to prescribe guidelines for determining when a person "operates" a place of public accommodation within the meaning of Title III of the ADA:

> [A]n individual may be liable as an operator of a public accommodation where (a) he or she is in a position of authority; (b)

---

**14.** In relevant part, the enforcement provision of Title III of the ADA states:

> (1) Availability of remedies and procedures. The remedies and procedures set forth in section 204(a) of the Civil Rights Act of 1964 (42 U.S.C.2000a–3(a)) are the remedies and procedures this title provides to any person who is being subjected to discrimination on the basis of disability.... Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a *person* or organization covered by this title does not intend to comply with its provisions.

42 U.S.C.S. § 12188(a) (Supp.1996) (emphasis added). Section 204(a) of the Civil Rights Act provides:

> Whenever any *person* has engaged or there are reasonable grounds to believe that any *person* is about to engage in any act or practice prohibited by section 203 [42 USCS § 2000A–2], a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved ...

42 U.S.C.S. § 2000a–3 (1989) (emphasis added).

within the ambit of this authority he or she has both the power and discretion to perform potentially discriminatory acts; and (c) the discriminatory acts are the result of the exercise of the individual's own discretion, as opposed to the implementation of institutional policy or the mandates of superiors.

*Id.* at 788. Given these persuasive interpretations of what it means to "operate" a place of public accommodation for the purpose of Title III of the ADA, this Court concludes that the plaintiffs have alleged facts sufficient to support an ADA claim against defendant Silber, but that the ADA claim against Craig Klafter must be dismissed.

The complaint asserts that John Silber is the current Chancellor of BU and was "President of Boston University during the formulation of Boston University's new policy against students with learning disabilities." Cmplt. ¶ 26. It also states that Silber is responsible for insuring that the university complies with state and federal law, and that, although Silber has been made aware of the students' "illegal treatment," he "nevertheless knowingly has participated in carrying out and continuing the discriminatory policies of Boston University." *Id.* When the allegations of the complaint are taken as true and all reasonable inferences are made in favor of the plaintiffs, this Court finds that the facts alleged are sufficient to support an inference that, as the former president and the current Chancellor of BU, Silber is in a position of authority and discretion such that he may be deemed to "operate" the university within the meaning of the ADA.

Whether the allegations of the complaint support plaintiffs' argument that Craig Klafter "operates" BU presents a much closer question. The complaint labels Craig Klafter as "the assistant to President Westling," BU's current president. It maintains that although he, too, "is responsible for insuring that students with disabilities in Boston University are treated in compliance with state and federal law," Klafter has knowingly "participated in carrying out and continuing" the university's allegedly discriminatory accommodations policies. Cmplt. ¶ 27. The complaint alleges, even more specifically, that

Klafter "assists Defendant Westling in reviewing student applications for reasonable accommodation." *Id.*

Klafter's alleged role as an "assistant" undermines the plaintiffs' argument that he exercises the authority, control, or discretion is necessary for one to be deemed an "operator" of a place of public accommodation for the purpose of liability under Title III. In the complaint, plaintiffs allege only that Klafter assists in the perpetration of BU's discriminatory policy, and, by making such a characterization, plaintiffs have failed to state facts sufficient to support the claim that Klafter is subject to individual liability under the ADA.

Defendants' motion to dismiss the ADA claims against Silber is ***DENIED;*** however, the motion to dismiss the ADA claims against Klafter is ***ALLOWED.***

 b. *Rehabilitation Act Claims Against Silber and Klafter*

 Section 504 of the Rehabilitation Act states:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a) (Supp.1996). Because " 'Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as part of the decision whether or not to receive federal funds,' " individuals can be held liable for violations of the Rehabilitation Act if they are "in a position to accept or reject federal assistance" for a program or activity. *Glanz v. Vernick,* 756 F.Supp. 632, 637 (D.Mass. 1991) (quoting *United States · Dep't of Transp. v. Paralyzed Veterans of Am.,* 477 U.S. 597, 606, 106 S.Ct. 2705, 2711, 91 L.Ed.2d 494 (1986)). As the alleged president-turned-Chancellor of Boston University, John Silber is likely to have the authority to receive federal funds on behalf of the university, and, thus, he can be held liable under the Rehabilitation Act. *See Doe v. City of Chicago,* 883 F.Supp. 1126, 1137 (N.D.Ill.

1994) (finding that plaintiffs need not allege specifically that the individual defendants had discretion to accept funding as long as defendants "could exercise such authority consistently with the allegations of the complaint").

On the other hand, plaintiffs have not stated facts to support an inference that Klafter is in a position to control the influx of federal dollars. *See Johnson v. N.Y. Hosp.*, 897 F.Supp. 83, 85 (S.D.N.Y.1995) (finding that a hospital president who plays a significant role in deciding whether or not to receive funds may be held individually liable under the Rehabilitation Act, but that the assistant director of nursing may not). Thus, the motion to dismiss the Rehabilitation Act claims against Klafter is *ALLOWED;* however, the motion to dismiss this claim against Silber is *DENIED.*

### c. *Article 114 Claims Against Silber and Klafter*

■ Article 114 of the Amendments to the Massachusetts constitution prohibits any "otherwise qualified handicapped individual" from being "excluded from the participation in, denied the benefits of, or be[ing] subject to discrimination under any program or activity within the commonwealth." Although the amendment is modeled after Section 504 of the federal Rehabilitation Act, *see Layne v. Superintendent, Mass. Correctional Inst.,* 406 Mass. 156, 159, 546 N.E.2d 166, 168 (1989), the susceptibility of individuals to liability under the state constitution is seemingly greater than individual vulnerability under the federal anti-discrimination provision. By its plain language, the amendment does not limit the pool of potential defendants to public actors, *see Grubba v. Bay State Abrasives, Inc.,* 803 F.2d 746, 747–48 (1st Cir.1986) (finding no explicit state action provision), or individuals who receive funding for or operate a program or activity within the commonwealth. Rather, the amendment appears to sweep broadly, " 'secur[ing]' the right of handicapped persons against discrimination," *Grubba,* 803 F.2d at 747, perpetrated by any private person or entity. *Cf. Layne,* 406

Mass. at 160, 546 N.E.2d 166 ("We have no difficulty in concluding in this case that the plaintiffs would have been entitled to a declaration of right . . . and to injunctive relief as long as any rights under art. 114 were denied to them.").

■ Because of the seemingly unlimited anti-discrimination obligation that Article 114 imposes, and in light of the Supreme Judicial Court's finding that "a person whose constitutional rights have been interfered with may be entitled to judicial relief" directly under the state constitution, *Phillips v. Youth Dev. Program, Inc.,* 390 Mass. 652, 657–58, 459 N.E.2d 453, 457 (1983), this Court holds that private individuals may be held responsible for violating Article 114 of the state constitution in a suit seeking injunctive and declaratory relief.[15] Moreover, this Court finds that the alleged participation of defendants' Silber and Klafter in continuing and carrying out BU's allegedly discriminatory accommodations policy is sufficient to support plaintiffs' injunctive and declaratory claims against them.

The defendants' motion to dismiss the Article 114 claims against defendants Silber and Klafter is *DENIED.*

### d. *Breach of Contract Claims Against Silber and Klafter*

■ The breach of contract claims against John Silber and Craig Klafter must be dismissed as a matter of law. The complaint alleges only that defendant BU published and disseminated promotional materials regarding the accommodations that BU students with learning disabilities are entitled to receive and that plaintiffs relied on these representations. Because "the officer ordinarily is not liable for the corporation's breach of contract" under Massachusetts law, *Union Mut. Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1, 11 (1st Cir.1986), John Silber and Craig Klafter cannot be held liable for BU's alleged contract breach. *See id.* at 11–12 ("In the absence of malice, one who knowingly and voluntarily contracts with a corporation must look to the corporation, not to its

---

**15.** Because plaintiffs do not assert individual liability for monetary damages, this Court does not address whether Article 114 can be the basis of a claim for compensatory relief.

officers, for redress, even for 'obvious' failures to perform contractual promises.").

## IV. CLASS CERTIFICATION

### A. Legal Standard

"An action may be brought as a class action if it meets the criteria set out in Rule 23 of the Federal Rules of Civil Procedure." *Mattoon v. City of Pittsfield,* 128 F.R.D. 17, 19 (D.Mass.1989). Rule 23(a) states:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to these prerequisites of numerosity, commonality, typicality, and adequacy, plaintiffs seeking class action status must also satisfy one of the three parts of Rule 23(b). *See* Fed. R.Civ.P. 23(b); *Mattoon,* 128 F.R.D. at 19. The plaintiffs in this action seek certification under Rule 23(b)(2), which authorizes a class action where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R.Civ.P. 23(b)(2). The moving party has the burden of demonstrating that all of the prerequisites to certification under Rules 23(a) and 23(b) have been met. *See Grace v. Perception Technology Corp.,* 128 F.R.D. 165, 167 (D.Mass.1989); *see also Lamphere v. Brown Univ.,* 553 F.2d 714 (1st Cir.1977) (giving district court discretion to look beyond the pleadings in deciding whether plaintiffs have met this burden).

### B. Rule 23(a) Prerequisites

#### 1. Numerosity

The first certification *hurdle* is a showing that there is a class of persons which "is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). The complaint alleges that 480 learning-disabled students were enrolled at BU during the 1995–1996 school year, and that these students would be subject to the university's new "discriminatory" procedure if they sought accommodation from the university. Because it would be impracticable to join as plaintiffs the nearly five hundred BU students with learning disabilities who may seek accommodations under the university's new policy, there is a class of currently-enrolled, learning-disabled students that is sufficiently numerous to satisfy Rule 23(a)(1).

#### 2. Commonality and Typicality

"The 'typicality' and 'commonality' prerequisites of Rule 23 do not require that all of the putative class members share identical claims"; rather "[t]hese prerequisites mandate only that complainants' claims be common, and not in conflict." *Hassine v. Jeffes,* 846 F.2d 169, 176–77 (3rd Cir.1988). Because all BU students with learning disabilities are subject to the university's new accommodations policy, facial challenges to that allegedly discriminatory procedure involve common questions of fact and law.

Closely related to commonality, the typicality prerequisite "focuses primarily on the extent to which the proposed class representatives encompass the claim of the other class members." *Lintemuth v. Saturn Corp.,* 1994 WL 760811 (M.D.Tenn.1994). The typicality requirement is satisfied "when the [named] plaintiff's injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims," and "when the plaintiff's claims and those of the class are based on the same legal theory." *In re Bank of Boston,* 762 F.Supp. 1525, 1532 (D.Mass.1991).

Defendants argue that the representative plaintiffs in this case do not have "typical" claims because the plaintiffs allegedly have various learning disabilities, which give rise to different statutory rights and modes of accommodation. Several courts have analyzed ADA and Rehabilitation Act claims on a case-by-case basis and have refused to confer class action status for actions involving the denial of reasonable accommodations. *See, e.g., Chandler v. City of Dallas,*

2 F.3d 1385, 1396 (5th Cir.1993) (finding class certification inappropriate because "the determinations of whether an individual is handicapped or 'otherwise qualified' are necessarily individualized inquiries"), *cert. denied*, 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994).

The plaintiffs here are not challenging the university's failure to accommodate particular students, nor are they seeking to secure a specific accommodation for any particular type of learning disability. Rather, the plaintiffs assert that BU's blanket accommodations policy—requiring recent documentation, subjecting requests to a multi-tiered and unappealable review process, and prohibiting course-substitutions—is itself discriminatory and thus inconsistent with state and federal law. As current students with learning disabilities who are subject to the university's allegedly discriminatory new policy, the named representatives' claims are typical of those of the class.[16]

### 3. Adequacy

In making the required determination regarding the adequacy of the named plaintiffs as class representatives, a court must decide "first, whether any potential conflicts exist between the named plaintiffs and the prospective class members, and, second, whether the named plaintiffs and their counsel will prosecute their case vigorously." *In re Bank of Boston*, 762 F.Supp. 1525, 1534 (D.Mass. 1991). Nothing in the record suggests that the named plaintiffs will be inconsistent or inadequate representatives of the proposed plaintiff class, and the defendants do not appear to contest this issue. This Court finds that the fourth Rule 23(a) requirement is satisfied.

### C. *Rule 23(b)(2)*

■ The plaintiffs seek class certification pursuant to Fed.R. Civ.P. 231(b)(2) on the ground that BU has acted or refused to act in a manner generally applicable to the class, "thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R.Civ.P. 231(b)(2). It is well-established that, more than the precise number of individual members who can claim entitlement to relief, "the conduct complained of is the benchmark for determining whether a(b)(2) class exists." *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir.1972); *accord McCuin v. Secretary of Health and Human Serv.*, 817 F.2d 161, 167 (1st Cir.1987). To the extent that the plaintiffs seek injunctive and declaratory relief only with respect to BU's new policy, class certification is warranted.[17]

■ Defendants maintain that this Court should refuse to certify a Rule 23(b)(2) class of plaintiffs because the plaintiffs do not need to proceed as a class in order to obtain the requested injunctive and declaratory relief. In *Dionne v. Bouley*, 757 F.2d 1344, 1355 (1st Cir.1985), the First Circuit considered whether courts in this jurisdiction must adopt "a practice, followed by several circuits, of denying class certification under Rule 23(b)(2), when a class is not needed to obtain the same relief." Rejecting the idea of "a strict 'necessity requirement' under Rule 23(b)(2)," *id.* at 1356, the *Dionne* court determined that "when the same relief can be obtained without certifying a class, a court *may* be justified in concluding that class relief is not 'appropriate.'" *Id.* (emphasis added). Although *Dionne* gives trial judges the discretion to deny certification under Rule 23(b)(2) if the class is unnecessary, the First Circuit pointed out that "other considerations," such as the danger of mootness, "may render a denial of certification improper." *Id.*

The danger of mootness is great enough in the instant litigation to necessitate class certification. Students graduate, transfer, drop

---

**16.** The individual plaintiffs also include the Law Disability Caucus ("LDC"), an organization that is currently comprised of learning-disabled students at BU.

**17.** At the hearing on class certification, the named plaintiffs clarified that they so not seek certification with respect to claims for compen-

satory damages. This Court considers certification only in regard to the plaintiffs, requests for prospective relief. *See Santiago v. City of Phila.*, 72 F.R.D. 619, 627–28 (E.D.Pa.1976) (certifying a 23(b)(2) class to pursue injunctive and declaratory relief, but deferring class certification regarding claims for money damages).

out, move away, grow disinterested, fall in love. Certainly, if a concern arises early enough in a claimant's educational odyssey, it may be heard court. However, all too often student-initiated disputes escape review. *See, e.g., Fox v. Bd. of Trustees of the State Univ. of N.Y.*, 42 F.3d 135, 137 (2nd Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2634, 132 L.Ed.2d 873 (1995); *Mincone v. Nassau County Community College*, 923 F.Supp. 398, 404 (E.D.N.Y.1996). The class action mechanism solves this potential mootness problem. *See Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975) (holding that a class action may continue "even though the claim of the named plaintiff has become moot"). Certification is appropriate in this case.

D. *Scope of the Class*

 Plaintiffs have proposed that the class consist not only of learning-disabled students who are currently enrolled at BU, but also of individuals with learning disabilities who "were deterred from applying to or enrolling in Boston University or will be so deterred in the future." *Plaintiff's Proposed Order,* at 2. It is here that this Court will invoke its discretion to limit the unnecessary. Even if deterred applicants to BU have standing to sue the university, their inclusion in the class does little either to further the plaintiffs' goal of obtaining declaratory and injunctive relief or to resolve the problem of mootness. Nothing is gained by conferring membership on individuals with learning disabilities who have been deterred. In the exercise of its discretion, this Court restricts the certified class to students with learning disabilities who are currently enrolled at BU. *See Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 131 (1st Cir.1985) (holding that the judge's restriction of the class was not an abuse of discretion), *cert. denied,* 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986).

## ORDER

The Court orders as follows:

(1) Defendants' motion to dismiss is *ALLOWED* with respect to Counts IV, VI, and VII; and is *DENIED* with respect to Count V.

(2) By agreement, plaintiffs Freedman and LaBrogue are dismissed.

(3) The Court *ALLOWS* defendants' motion to dismiss AHEAD, CHADD and ODS, but *DENIES* their motion to dismiss LDC. AHEAD, CHADD, and ODS are invited to submit amicus briefs.

(4) The Court *ALLOWS* plaintiffs' motion to certify a plaintiff class pursuant to Fed. R.Civ.P. 23(b)(2) to include the following:

all students with learning disabilities and/or attention deficit disorder who are currently enrolled at Boston University.

(5) The motion to dismiss Silber is *ALLOWED* with respect to Count V only.

(6) The motion to dismiss Klafter is *ALLOWED* as to all claims except the claim for equitable relief under Article 114 (Count III).